# EXHIBIT A



# SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
## CIVIL DIVISION
### Received Merck Legal Dept.

PAULA BROWNSTEIN
Vs.
MERCK AND COMPANY

**SEP 2 9 2014**

Whitehouse Station, NJ     C.A. No.     2014 CA 005958 B

## INITIAL ORDER AND ADDENDUM

Pursuant to D.C. Code § 11-906 and District of Columbia Superior Court Rule of Civil Procedure ("SCR Civ") 40-I, it is hereby **ORDERED** as follows:

(1) Effective this date, this case has assigned to the individual calendar designated below. All future filings in this case shall bear the calendar number and the judge's name beneath the case number in the caption. On filing any motion or paper related thereto, one copy (for the judge) must be delivered to the Clerk along with the original.

(2) Within 60 days of the filing of the complaint, plaintiff must file proof of serving on each defendant: copies of the Summons, the Complaint, and this Initial Order. As to any defendant for whom such proof of service has not been filed, the Complaint will be dismissed without prejudice for want of prosecution unless the time for serving the defendant has been extended as provided in SCR Civ 4(m).

(3) Within 20 days of service as described above, except as otherwise noted in SCR Civ 12, each defendant must respond to the Complaint by filing an Answer or other responsive pleading. As to the defendant who has failed to respond, a default and judgment will be entered unless the time to respond has been extended as provided in SCR Civ 55(a).

(4) At the time and place noted below, all counsel and unrepresented parties shall appear before the assigned judge at an Initial Scheduling and Settlement Conference to discuss the possibilities of settlement and to establish a schedule for the completion of all proceedings, including, normally, either mediation, case evaluation, or arbitration. Counsel shall discuss with their clients **prior** to the conference whether the clients are agreeable to binding or non-binding arbitration. **This order is the only notice that parties and counsel will receive concerning this Conference.**

(5) Upon advice that the date noted below is inconvenient for any party or counsel, the Quality Review Branch (202) 879-1750 may continue the Conference **once**, with the consent of all parties, to either of the two succeeding Fridays. Request must be made not less than six business days before the scheduling conference date. No other continuance of the conference will be granted except upon motion for good cause shown.

(6) Parties are responsible for obtaining and complying with all requirements of the General Order for Civil cases, each Judge's Supplement to the General Order and the General Mediation Order. Copies of these orders are available in the Courtroom and on the Court's website http://www.dccourts.gov/.

Chief Judge Lee F. Satterfield

Case Assigned to:  Judge STUART G NASH
Date:   September 19, 2014
Initial Conference: 9:30 am, Friday, December 19, 2014
Location:   Courtroom A-47
      515 5th Street NW
      WASHINGTON, DC  20001

Caio.doc

## ADDENDUM TO INITIAL ORDER AFFECTING
## ALL MEDICAL MALPRACTICE CASES

In accordance with the Medical Malpractice Proceedings Act of 2006, D.C. Code § 16-2801, et seq. (2007 Winter Supp.), "[a]fter an action is filed in the court against a healthcare provider alleging medical malpractice, the court shall require the parties to enter into mediation, without discovery or, if all parties agree[,] with only limited discovery that will not interfere with the completion of mediation within 30 days of the Initial Scheduling and Settlement Conference ("ISSC"), prior to any further litigation in an effort to reach a settlement agreement. The early mediation schedule shall be included in the Scheduling Order following the ISSC. Unless all parties agree, the stay of discovery shall not be more than 30 days after the ISSC." D.C. Code § 16-2821.

To ensure compliance with this legislation, on or before the date of the ISSC, the Court will notify all attorneys and *pro se* parties of the date and time of the early mediation session and the name of the assigned mediator. Information about the early mediation date also is available over the internet at https://www.dccourts.gov/pa/. To facilitate this process, all counsel and *pro se* parties in every medical malpractice case are required to confer, jointly complete and sign an EARLY MEDIATION FORM, which must be filed no later than ten (10) calendar days prior to the ISSC. Two separate Early Mediation Forms are available. Both forms may be obtained at www.dccourts.gov/medmalmediation. One form is to be used for early mediation with a mediator from the multi-door medical malpractice mediator roster; the second form is to be used for early mediation with a private mediator. Both forms also are available in the Multi-Door Dispute Resolution Office, Suite 2900, 410 E Street, N.W. Plaintiff's counsel is responsible for eFiling the form and is required to e-mail a courtesy copy to earlymedmal@dcsc.gov. *Pro se* Plaintiffs who elect not to eFile may file by hand in the Multi-Door Dispute Resolution Office.

A roster of medical malpractice mediators available through the Court's Multi-Door Dispute Resolution Division, with biographical information about each mediator, can be found at www.dccourts.gov/medmalmediation/mediatorprofiles. All individuals on the roster are judges or lawyers with at least 10 years of significant experience in medical malpractice litigation. D.C. Code § 16-2823(a). If the parties cannot agree on a mediator, the Court will appoint one. D.C. Code § 16-2823(b).

The following persons are required by statute to attend personally the Early Mediation Conference: (1) all parties; (2) for parties that are not individuals, a representative with settlement authority; (3) in cases involving an insurance company, a representative of the company with settlement authority; and (4) attorneys representing each party with primary responsibility for the case. D.C. Code § 16-2824.

No later than ten (10) days after the early mediation session has terminated, Plaintiff must eFile with the Court a report prepared by the mediator, including a private mediator, regarding: (1) attendance; (2) whether a settlement was reached; or, (3) if a settlement was not reached, any agreements to narrow the scope of the dispute, limit discovery, facilitate future settlement, hold another mediation session, or otherwise reduce the cost and time of trial preparation. D.C. Code § 16-2826. Any Plaintiff who is *pro se* may elect to file the report by hand with the Civil Clerk's Office. The forms to be used for early mediation reports are available at www.dccourts.gov/medmalmediation.

Chief Judge Lee F. Satterfield



**Superior Court of the District of Columbia**
**CIVIL DIVISION**
500 Indiana Avenue, N.W., Suite 5000
Washington, D.C. 20001 Telephone: (202) 879-1133

_PAULA BROWNSTEIN_
_____
Plaintiff

vs.

_MERCK & CO_
_____
Defendant

Case Number   14 - 0 0 0 5 9 5 8

## SUMMONS

To the above named Defendant:

You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty (20) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the party plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within five (5) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

_AARON M. LEVINE_
Name of Plaintiff's Attorney

_1111 14th ST, NW, SUITE 400_
Address

_WASHINGTON, DC 20036_

_202-833-8040_
Telephone

Clerk of the Court

By _____
Deputy Clerk

Date   _9/19/14_

如需翻译,请打电话 (202) 879-4828          Veuillez appeler au (202) 879-4828 pour une traduction          Để có một bài dịch, hãy gọi (202) 879-4828
번역을 원하시면, (202) 879-4828 로 전화주십시오          ያስፈልግ ተርጓሚ ለማግኘት (202) 879-4828 ይደውሉ

IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, _DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME._

If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español

FORM SUMMONS - Jan. 2011                                                                                      CASUM.doc





## TRIBUNAL SUPERIOR DEL DISTRITO DE COLUMBIA
### DIVISIÓN CIVIL
**500 Indiana Avenue, N.W., Suite 5000**
**Washington, D.C. 20001 Teléfono: (202) 879-1133**

|  |  |
|---|---|
|  | Demandante |
| contra |  |

Número de Caso: _____

_____
Demandado

### CITATORIO

Al susodicho Demandado:

Por la presente se le cita a comparecer y se le require entregar una Contestación a la Demanda adjunta, sea en persona o por medio de un abogado, en el plazo de veinte (20) días contados después que usted haya recibido este citatorio, excluyendo el día mismo de la entrega del citatorio. Si usted está siendo demandado en calidad de oficial o agente del Gobierno de los Estados Unidos de Norteamérica o del Gobierno del Distrito de Columbia, tiene usted sesenta (60) días contados después que usted haya recibido este citatorio, para entregar su Contestación. Tiene que enviarle por correo una copia de su Contestación al abogado de la parte demandante. El nombre y dirección del abogado aparecen al final de este documento. Si el demandado no tiene abogado, tiene que enviarle al demandante una copia de la Contestación por correo a la dirección que aparece en este Citatorio.

A usted también se le require presentar la Contestación original al Tribunal en la Oficina 5000, sito en 500 Indiana Avenue, N.W., entre las 8:30 a.m. y 5:00 p.m., de lunes a viernes o entre las 9:00 a.m. y las 12:00 del mediodía los sábados. Usted puede presentar la Contestación original ante el Juez ya sea antes que Usted le entregue al demandante una copia de la Contestación o en el plazo de cinco (5) días de haberle hecho la entrega al demandante. Si usted incumple con presentar una Contestación, podría dictarse un fallo en rebeldía contra usted para que se haga efectivo el desagravio que se busca en la demanda.

*SECRETARIO DEL TRIBUNAL*

_____
Nombre del abogado del Demandante

_____
Dirección

Por: _____

Subsecretario

_____
Teléfono

Fecha _____

如需翻译,请打电话 (202) 879-4828     Veuillez appeler au (202) 879-4828 pour une traduction     Để có một bài dịch, hãy gọi (202) 879-4828
번역을 원하시면, (202) 879-4828 로 전화하십시오     የአማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ

IMPORTANTE: SI USTED INCUMPLE CON PRESENTAR UNA CONTESTACIÓN EN EL PLAZO ANTES MENCIONADO, O, SI LUEGO DE CONTESTAR, USTED NO COMPARECE CUANDO LE AVISE EL JUZGADO, PODRÍA DICTARSE UN FALLO EN REBELDÍA CONTRA USTED PARA QUE SE LE COBRE LOS DAÑOS Y PERJUICIOS U OTRO DESAGRAVIO QUE SE BUSQUE EN LA DEMANDA. SI ESTO OCURRE, PODRÍAN RETENERLE SUS INGRESOS, O PODRÍAN TOMAR SUS BIENES PERSONALES O RAÍCES Y VENDERLOS PARA PAGAR EL FALLO. SI USTED PRETENDE OPONERSE A ESTA ACCIÓN, *NO DEJE DE CONTESTAR LA DEMANDA DENTRO DEL PLAZO EXIGIDO*.

Si desea conversar con un abogado y le parece que no puede afrontar el costo de uno, llame pronto a una de nuestras oficinas del Legal Aid Society (202-628-1161) o el Neighborhood Legal Services (202-279-5100) para pedir ayuda o venga a la Oficina 5000 del 500 Indiana Avenue, N.W., para informarse de otros lugares donde puede pedir ayuda al respecto.

Vea al dorso el original en inglés
See reverse side for English original

CASUM.doc

IN THE SUPERIOR COURT
FOR THE DISTRICT OF COLUMBIA
Civil Division

PAULA BROWNSTEIN ]
2060 Prosser Avenue ]
Los Angeles, CA 90025 ]
]
      Plaintiff, ]
]
  v. ]
]
MERCK AND COMPANY, ]
a successor to White Labs, ]
Schering Corporation and Schering ]
Plough Corporation ]
P.O. BOX 4 ]
West Point, Pa. 19486 ]
]
W/S/O: ]
601 Pennsylvania Avenue, N.W. ]
Washington, D.C.  20005 ]
]
      Defendant. ]
]

Case No.



RECEIVED AND RETURNED
Civil Clerk's Office

SEP 1 9 2014

Superior Court of the
District of Columbia
Washington, D.C.

14 - 0 0 0 5 9 5 8

## COMPLAINT
**(Dienestrol/DES Litigation – Products Liability, Punitive Damages)**

1.    Jurisdiction is founded upon 11 D.C. Code §921 (1981 ed.).

2.    Defendant is engaged and has been engaged in the manufacturing, marketing, sale, promotion, and distribution of pharmaceuticals throughout the United States, and is doing business and deriving substantial revenue in the District of Columbia, and its predecessor White Labs (hereinafter referred to as "White") sought and obtained approval for Dienestrol within the District of Columbia.

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

3.    Dienestrol is a synthetic estrogen. It is a congener (similar compound) to Diethylstilbestrol/DES, a sister or "me-too" drug. Dienestrol and DES have the same bio-

equivalency and physiologic effects. When the Defendant's predecessor White sought approval from the Food & Drug Administration ("FDA") for permission to market Dienestrol, it's New Drug Application (NDA) "piggy-backed" on the safety and efficacy studies that had been submitted by the DES manufacturers previously.

1.      Megadose-Estrogen therapy, DES or Dienestrol up to 100 mg. per day, as a panacea for making babies, was slipped past the FDA by many U.S. drug houses, without a single adequate scientific study as to the efficacy or safety in pregnancy of Mega-Estrogen. The support for the approval of Megadose-Estrogen was based on a single report of a Boston husband-and-wife team, the Smiths (one not even a physician, the other using flawed and unscientific testing).

2.      In 1948, Drs. George and Olive Smith conducted an uncontrolled, apocryphal, and unscientific study purporting to show that DES reduced the incidence of miscarriage.  Their results could not be replicated by other studies, see e.g., M.E. Davis and N.W. Fugo, "Effects of Various Sex Hormones on Excretion of Pregnandiol Early in Pregnancy," 65 Proceedings of the Soc. Experimental Biol. and Med. 39 (1947), and were found to be lacking in scientific rigor. See Arthur King, "Threatened and Repeated Abortion: Present Status of Therapy," 1 Obstetrics and Gynecology 104 (1953).  Nonetheless, the "Smith & Smith" regimen calling for 5mg of DES per day, increasing weekly throughout the pregnancy to 125mg per day, was embraced and adopted and promulgated by Defendant's predessor.  This regimen resulted in the exposure to an average of 16,100 mg of DES by the developing fetuses during their gestation.  This dosage was equivalent to the estrogenic influence to over 53,000 birth control pills, all absorbed while fetuses, like Plaintiff Paula Brownstein, were still developing in utero.

2

3.    The rationale was that progesterone levels in the urine of women who had miscarried were found to be low. The Smiths postulated that giving Megadose-Dienestrol or DES, (a synthetic estrogen – the natural estrogen being too expensive) to pregnant women would increase their progesterone levels. When they gave Dienestrol/DES, the Smiths thought they were getting higher hormone levels in these women's urine. In fact, the Smiths were mistakenly measuring the Dienestrol/DES itself in the urine.

4.    Dienestrol/DES was invented in the 1930s in London by Sir Charles Dodds, who was seeking to cheaply synthesize carcinogenic compounds for cancer research. It was promoted by the Defendant's predecessor White initially to treat vaginal complications of menopausal women for many years as it had the power to affect the reproductive tract of recipients. It never occurred to the Defendant's predecessor that it might also affect the reproductive tract of forming female fetuses.

5.    The Defendant's predecessor White, as well as many other manufacturers, created a market for this therapy without a single study, in animals or humans, to determine the long-term delayed effects of Megadose-Estrogen on the sexual tract of the exposed fetus, even though Defendant's predecessor White knew, from previous reports in the literature, and its own recommended uses in non-pregnant women, that Dienestrol/DES had a powerful effect on the sex glands of animals and humans, fetal or live, because of the estrogen sensitivity of those organs.

6.    In 1939 Professors Greene, Burrill, and Ivy ("Experimental Intersexuality: the Paradoxical Effects of Estrogens on the Sexual Development of the Female Rat," 74 Anatomical Record 429 (1939).) of Northwestern University, reported changes in the vagina, uterus and ovaries of mice born of mothers receiving Dienestrol/DES. Estrogen had a long history of being

3

a teratogen and carcinogen, which reports never accompanied White's new drug application to the FDA.

7.     Prior to pregnancy use, Dienestrol/DES was marketed for five years as an estrogen replacement, primarily used for senile vaginitis, in dosages of 1 to .01 milligram. Even though the scientific literature stated that Dienestrol/DES was nine times more powerful than the natural estrogen and that it resisted the body's attempts to metabolize and excrete it, thereby accumulating in the blood, they went into the pregnancy market in 1950 knowing that (i) the drug could cross the placenta and affect the fetus, (ii) forming fetal tissue was particularly susceptible to the chemical, (iii) the drug targeted sexual organs, (iv) the drug was a carcinogen, and (v) the drug was resistant to break-down by usual metabolism mechanisms. In spite of all this, Defendant's predecessor White recommended an increase of the dosage for use in pregnancy by 100 to 1,000 times. Current birth control pills, which also seek to create a progesterone/estrogen effect, contain .03 micrograms of estrogen. In other words, under Defendant's predecessor's recommendation, pregnant women were taking the estrogenic equivalent of 700 birth control pills a day.

8.     The FDA and the medical profession were never provided with (i) the reports of transplacental changes from estrogens and other drugs, (ii) the cancer-causing references of estrogen and Dienestrol/DES, (iii) the warnings regarding this type of Megadose therapy, (iv) reports of sexual tract abnormalities from Megadose-Estrogen exposure, nor (v) reports of the latency effect of such drug.

9.     In 1947, Dr. Rosenblum from Cedars of Lebanon Hospital in Los Angeles published on Dienestrol/DES and its effects on offspring and asked four major questions in his nationwide article:

a. Will DES in large doses cause pituitary or other glandular imbalance while will become manifest later in life?

b. Is DES in such large doses carcinogenic, and as such unsafe to give even to pregnant women?

c. Can DES in any way affect the glandular balance of the child *in utero*, particularly the female child?

d. Is DES the drug which will give better results in general for the treatment of threatened or habitual abortion than drugs previously used?

"Preservation of Threatened Pregnancy with Particular Reference to the Use of Diethylstilbestrol," The Western J. Surg. Obst. & Gynec., 55:597, 1947.

10.     The Defendant's predecessor White was bound as an ethical drug manufacturer to answer these questions before its nationwide campaign. It did not.

11.     By the mid-1950s, through the Defendants' predecessor's  promotional activities, most U.S. obstetricians were prescribing Dienestrol/DES to pregnant women who had a previous miscarriage or were staining or bleeding during pregnancy in an attempt to save the pregnancy. Although many physicians and scientists around the world questioned whether Dienestrol/DES could pass through the placenta directly to the fetus with damaging effects on the developing female reproductive system, Defendant's predecessor White represented to physicians and the FDA that Dienestrol/DES was safe for both mother and child. Not the slightest hint of any risk to the fetus was carried in any of its labeling.

12.     By 1950, reports emanated from the U.S. Department of Agriculture that minks fed chicken necks implanted with Dienestrol/DES were failing to reproduce. Dienestrol/DES at that

time was used in animal feed. ("Mink Production in Relation to Stilbestrol," The Fur Journal, Vol. XVI, Sept. – Oct. 1950.)

13.   In 1953, Dr. Dieckmann, one  of the most prominent obstetricians in America, and his associates at the University of Chicago, in the first and only controlled double-blind prospective test of the efficacy of DES, concluded that there were more births in the women not exposed to DES than in the equal control of DES-exposed women. (Dieckmann, Davis, Rynkiewicz, and Pottinger, "Does the Administration of Dienestrol During Pregnancy Have Therapeutic Value?, Am. J. Obstet & Gynec., 66:1062, 1953.)

14.   Defendant's predecessor White was on notice in the mid-1950s that other drug houses were doing offspring testing on drugs, but failed to test Dienestrol/DES for its effect on the fetus. These other drug companies such as Wallace Drug Company, Smith-Kline and French, Burroughs Wellcome and Roche, were performing fetal studies to determine the effects of drugs they were selling to pregnant women. Animal studies were conducted in 1950-1954 on such drugs as Miltown, Thorazine, Daraprim, and Valium. (Berger, F.M., "The Pharmacological Properties of 2-Methyl-2-n-Propyl 1, 3 – Propanediol Dicarbamate (Miltown), A New Interneuronal Blocking Agent," J. Pharmacology & Experimental Therapeutics, Vol. 112, Dec. 1954, No. 4.) The Defendant's predecessor failed to institute such tests and failed to advise the FDA and the medical profession of its lack of such testing.

15.   By 1956, a large population of exposed daughters had reached puberty where their Dienestrol/DES changes were visible. Had the Defendant's predecessor White been interested in the safety of its drug it could have commissioned a study to conduct internal examination on the Dienestrol/DES daughters which would have disclosed adenosis, vaginal epithelial changes and

cervical changes in 30% of exposed daughters (Herbst, "Vaginal and Cervical Abnormalities After Exposure to Dienestrol in Utero." Obstetrics & Gynecology, Sept. 1972).

16.   In 1959, a report of four cases of masculinization of female infants whose mothers received DES was reported in the Journal of Clinical Endocrinology. Bongiovani, Alfred, M.D., DiGeorge, Angelo, M.D., Grumback, Melvin, M.D. Masculinization of the Female Infant Associated with Estrogenic Therapy Alone During Gestation, 19:1004, 1959.

17.   In 1959, the U.S. FDA outlawed the use of DES in poultry and animals because of the carcinogenic properties.

18.   In 1960, Merck manual noted that DES "may cause or contribute to mammary or genital carcinoma in females."

19.   In 1961, the U.S. Department of Agriculture reported that the children of lambs receiving stilbestrol (another form of synthetic estrogen) suffered urethral occlusion and changes in their sex glands. March, Hadleigh D.V.M., Urethral Occlusion in Lambs on Feed Containing Stilbestrol, J. of Am. Veterinary Med. Assoc. 139:9, Nov. 1961, p. 1019.

20.   In 1962, thalidomide stories broke, putting the whole world on notice of the danger of giving drugs to pregnant women, and the U.S. Department of Health again reported that stilbestrol given to minks interfered with breeding and deformed the offspring.

21.   In 1971, Dr. Arthur Herbst and associates in Boston identified seven young girls with an unusual form of vaginal cancer (clear cell adenocarcinoma of the vagina). In an attempt to understand the epidemiology of this phenomenon, they discovered that all seven mothers had ingested Dienestrol/DES during pregnancy with their daughters – thus the Dienestrol/DES tragedy was uncovered. (Herbst, Ulfelder, and Poskanzer, Adenocarcinoma of the Vagina, 284 New Eng. J. Med. 878 (1971)).

22.  As a result of the above-referenced medical studies linking exposure to Dienestrol/DES to the subsequent development (after a 20-year latency period) of cancer and other cervical and vaginal anomalies, the FDA in 1971 banned Dienestrol/DES for use by pregnant women due to its probable danger and ineffectiveness.

23.  In addition to failing to test and ignoring the risks as to the safety of Dienestrol and thereby failing to warn the public of any risks at all, the Defendant's predecessor White misrepresented that Dienestrol was effective and safe. Defendant's predecessor's literature, distributed nationally, stated:

    a.  Effective to stop bleeding during pregnancy.

    b.  Beneficial to ovarian functions, irritation, and vaginitis.

    c.  "Most effective" agent to prevent miscarriage.

    d.  Start treatment even <u>before</u> bleeding.

    e.  More effective than progesterone.

    f.  Their Daily dosage recommended per day was safe.

    g.  Use <u>whenever</u> estrogenic therapy indicated.

    h.  Having no lasting side effects.

    i.  Having been adequately tested and proven safe.

24.  At no time before 1970 did Defendant's predecessor voluntarily re-evaluate the use of Dienestrol for the prevention of miscarriage.

25.  At no time before 1970 did Defendant's predecessor state that there was any specific risk to a child exposed to Dienestrol *in utero*. While Defendant's predecessor did, at the FDA's urging, place a statement in its packaging for Dienestrol that there was a potential

unnamed risk to the fetus, it was to be weighed against also unnamed benefits, and such risk was never publicized to doctors prior to the birth of Plaintiff Paula Brownstein.

26.     To the extent that Defendant's predecessor knew or should have known of the risk to a child *in utero* from Dienestrol, the volume and sizes of Dienestrol products sold should have alerted them to the fact that there was regular prescription of Dienestrol for prevention of miscarriage regardless of labeling and that an informational campaign would be necessary to avoid unnecessary harm to fetuses.

27.     Defendant's predecessor did not conduct any adequate human or animal tests regarding the safety to the exposed daughters and/or efficacy of Dienestrol. Although Dienestrol/DES was known to have estrogenic, carcinogenic and teratogenic effects, not a single controlled prospective study in humans or animals to test for safety or efficacy was conducted by Defendant's predecessor, nor was any obstetric or other medical specialist assigned to any clinical trials of Dienestrol by Defendant's predecessor. The medical professionals employed by Defendant's predecessor to monitor Dienestrol/DES reports, studies, and adverse events were not obstetricians, gynecologists, or otherwise trained or knowledgeable about reproductive issues.

28.     Even in the absence of testing by Defendant's predecessor, independent scientific studies showed that Dienestrol/DES was not safe or effective for use by pregnant women or their offspring, which Defendant's predecessor ignored.

29.     Defendant's predecessor knew, or should have known, that Dienestrol was a teratogen and carcinogen and was linked to cancer in the offspring of those exposed to Dienestrol.

30.     Defendant's predecessor knew, or should have known, that Dienestrol was not effective for prevention of miscarriage.

9

31.     Defendant's predecessor knew, or should have known, that the studies it provided to the Food and Drug Administration and the medical community regarding Dienestrol were not reliable, complete, nor accurate.

32.     Defendant's predecessor knowingly and intentionally promoted Dienestrol for use in pregnancy as safe and effective to prevent the threat of miscarriage, disregarding the published literature that warned of the risks and criticized its efficacy.

33.     Defendant's predecessor promoted Dienestrol for use in maintaining pregnancy as the most "effective" therapy to prevent miscarriage and recommended its use prophylactically even where no symptoms or signs of a threatened miscarriage appeared.

34.     Defendant's predecessor White fraudulently deceived the Food and Drug Administration, the obstetrical profession, and the mother of Plaintiff Paula Brownstein by knowingly and intentionally withholding adverse literature and studies or the paucity of testing, which Defendant's predecessor had a duty to provide to the Food and Drug Administration and the medical profession, and by submitting only favorable reports, which it knew originated in erroneous studies with incompetent investigators, using poorly designed test methods.

35.     Plaintiff Paula Brownstein was born in 1967 in the State of Massachusetts.

36.     During her pregnancy with Paula Brownstein, Plaintiff Paula Brownstein's mother was prescribed and ingested Dienestrol at the direction of her physician.

37.     The Dienestrol ingested by Paula Brownstein's mother was manufactured by Defendant's predecessor White.

38.     The doctor who prescribed Dienestrol to Paula Brownstein's mother relied upon the labeling and information provided by Defendant's predecessor, who listed information for

10

Dienestrol in the <u>Physician's Desk Reference</u> under its chemical name, and was the primary promoter of information regarding the prescription of Dienestrol to prevent miscarriage.

39.     Upon information and belief, Schering Corporation acquired White Laboratories in 1956. White Laboratories manufactured and distributed the Dienestrol to which Plaintiff was exposed. White Laboratories was a fully owned subsidiary of Schering Corporation. In 1971, Schering Corporation merged with Plough Corporation to form Schering-Plough Corporation. In 2009, Schering-Plough merged with Defendant Merck & Company and through a reverse merger Merck became a subsidiary of Schering-Plough, which renamed itself Merck & Co.

40.     Dienestrol has been linked by various studies to malformations of the reproductive organs of the children exposed *in utero*, including malformations of the cervix, uterus, and other segments of the female reproductive tract, which can cause infertility.

41.     Paula Brownstein has, among other reproductive malformations, a "T-shaped" uterus, a malformation which occurs, if not exclusively, almost exclusively in women who were Dienestrol or DES-exposed *in utero*.

42.     As a result of her reproductive malformations, Paula Brownstein has suffered infertility, has been unable to carry a child to term and has suffered miscarriages, despite multiple attempts with reproductive technology.

43.     Paula Brownstein's reproductive malformations and resulting inability to carry a child to term are caused in whole or in significant part by her exposure to Dienestrol.

<u>COUNT I</u>
**(Negligent Failure to Warn – Paula Brownstein)**

44.     It was the duty of Defendant's predecessor to adequately warn Paula Brownstein's mother and her attending physicians as to the risks of Dienestrol, its safety and efficacy at the time of the Plaintiff's *in utero* exposure to Dienestrol.

11

45.     Defendant's predecessor negligently failed to adequately warn Plaintiff Paula Brownstein's mother and her attending physicians of Dienestrol risks as to the safety and efficacy of Dienestrol.

46.     As a result of said negligence, Plaintiff Paula Brownstein was exposed *in utero* to Dienestrol, and she suffered injuries including, but not limited to, infertility, miscarriages, and inability to carry child to term, incurred medical expenses for care and treatment, and suffered physical and mental pain.

## COUNT II
### (Negligent Failure to Test – Paula Brownstein)

47.     All of the allegations contained in Count I are re-alleged and incorporated herein by reference.

48.     Defendant's predecessor had a duty to fully and adequately test Dienestrol, as to its safety and efficacy, before seeking FDA approval and continuing to sell Dienestrol for use in accidents of pregnancy.

49.     Defendant's predecessor negligently failed to test Dienestrol in any regard as to its safety and efficacy.

50.     As a result of Defendant's predecessor's said negligence, Plaintiff Paula Brownstein suffered injuries including, but not limited to, infertility, miscarriages, and inability to carry child to term, incurred medical expenses for care and treatment, and suffered physical and mental pain.

## COUNT III
### (Strict Liability – Paula Brownstein)

51.     All of the allegations contained in Count I and II are re-alleged and incorporated herein by reference.

52.     Dienestrol is, and at all times relevant to this action was, an unreasonably dangerous and defective drug when used by pregnant women for its advertised and intended purpose as a preventative of miscarriage.

53.     Defendant's predecessor White was engaged, or had been engaged, in the business of producing Dienestrol, and was, or had been, a commercial manufacturer of said drug.

54.     Plaintiff Paula Brownstein's mother purchased and ingested Dienestrol during her pregnancy with Plaintiff Paula Brownstein, and received and ingested Dienestrol in the same form and condition as when it left Defendant's predecessor's possession.

55.     Said product was defective when placed on the market by Defendant's predecessor White.  Dienestrol was sold by the Defendant's predecessor without sufficient warning or instructions.  A reasonable seller would not have sold the product had he/she known of the risks involved.  The risks were greater than a reasonable buyer would expect.

56.     Defendant's predecessor White knew, or should have known, that pregnant women and their attending physicians could not realize and could not detect the dangerous and harmful nature of Dienestrol.  Clear warnings as to the doubtful efficacy of Dienestrol and dangers to unborn children should have been disseminated to overcome Defendant's predecessor's extensive advertising campaigns proclaiming the safety and efficacy of Dienestrol.

57.     As a result of Defendant's predecessor's marketing and promotion of said defective and unreasonably dangerous drug, Plaintiff Paula Brownstein was exposed to Dienestrol as an unborn child and has suffered injuries including, but not limited to, infertility, miscarriages, and inability to carry child to term, incurred medical expenses for care and treatment, and suffered physical and mental pain..

58.     By reason of having marketed and promoted Dienestrol in its defective and unreasonably dangerous condition, Defendant is strictly liable to Plaintiff for her Dienestrol-related injuries, losses, and damages.

## COUNT IV
### (Breach of Warranty – Paula Brownstein)

59.     All of the allegations contained in Counts I through III are re-alleged and incorporated herein by reference.

60.     At all times relevant to this action, Defendant's predecessor marketed and promoted Dienestrol accompanied by implied and express warranties and representations to physicians and their patients that the drug was efficacious as a miscarriage preventative, and was safe for pregnant women and their unborn children if used as directed for such purposes.

61.     Defendant's predecessor knew, or should have known, that pregnant women, including the mother of Plaintiff Paula Brownstein, and her attending physicians, were relying on Defendant's predecessor's skills and judgments, and the implied and express warranties and representations.

62.     At all times relevant to this action, these implied and express warranties and representations were false, misleading, and unfounded.  In fact, Dienestrol was a misbranded drug in violation of federal law, and was neither safe nor efficacious as a miscarriage preventative.

63.     As a direct result of the breach of warranties by the Defendant's predecessor White, Plaintiff Paula Brownstein suffered injuries including, but not limited to, infertility, miscarriages, and inability to carry child to term, incurred medical expenses for care and treatment, and suffered physical and mental pain.

14

## COUNT V
### (Misrepresentation – Paula Brownstein)

64.    All of the allegations contained in Counts I through IV are re-alleged and incorporated herein by reference.

65.    Defendants predecessor represented to pregnant women, including the mother of Plaintiff Paula Brownstein and her attending physicians, in promotion campaigns, advertisements, labeling, and literature that Dienestrol/DES was safe, effective, and adequately tested, which representations were made and publicized with the purpose and intent of having physicians and their patients rely on them.

66.    The mother of the Plaintiff Paula Brownstein and her attending physicians did, in fact, rely on Defendant's predecessor's representations in its advice about purchase, use, and consumption of Dienestrol.

67.    At all times relevant to this action, these representations were known to Defendant's predecessor to be false or they were made by Defendant's predecessor in conscious, reckless and/or unreasonable disregard of facts available to Defendant's predecessor, indicating a lack of efficacy and a danger to pregnant women and their unborn children.

68.    As a direct result of said false representations by Defendant's predecessor, Plaintiff Paula Brownstein suffered injuries including, but not limited to, infertility, miscarriages, and inability to carry child to term, incurred medical expenses for care and treatment, and suffered physical and mental pain.

**WHEREFORE,** Plaintiff Paula Brownstein demands judgment against Defendant in the sum of Two Million Dollars ($2,000,000.00), as compensatory damages, plus costs.

# Superior Court of the District of Columbia

CIVIL DIVISION- CIVIL ACTIONS BRANCH

INFORMATION SHEET

PAULA BROWNSTEIN

Case Number: _____

vs

Date: _____

MERCK & CO.

☐ One of the defendants is being sued
in their official capacity.

| | |
|---|---|
| **Name:** *(Please Print)* <br> AARON M. LEVINE <br> **Firm Name:** <br> AARON LEVINE & ASSOCIATES, PLLC <br> **Telephone No.:**   **Six digit Unified Bar No.:** <br> 202-833-8040      7804 | **Relationship to Lawsuit** <br> ☑ Attorney for Plaintiff <br> ☐ Self (Pro Se) <br> ☐ Other: _____ |

TYPE OF CASE: ☐ Non-Jury   ☑ 6 Person Jury      ☐ 12 Person Jury

Demand: $ 2,000,000.00                 Other: _____

PENDING CASE(S) RELATED TO THE ACTION BEING FILED

Case No.:_____   Judge: _____   Calendar #:_____

Case No.:_____   Judge: _____   Calendar#:_____

---

## NATURE OF SUIT:   *(Check One Box Only)*

### A. CONTRACTS

**COLLECTION CASES**

| | | |
|---|---|---|
| ☐ 01 Breach of Contract | ☐ 07 Personal Property | ☐ 14 Under $25,000 Pltf. Grants Consent |
| ☐ 02 Breach of Warranty | ☐ 09 Real Property-Real Estate | ☐ 16 Under $25,000 Consent Denied |
| ☐ 06 Negotiable Instrument | ☐ 12 Specific Performance | ☐ 17 OVER $25,000 Pltf. Grants Consent |
| ☐ 15 Special Education Fees | ☐ 13 Employment Discrimination | ☐ 18 OVER $25,000 Consent Denied |
| ☐ 10 Mortgage Foreclosure | | |

### B. PROPERTY TORTS

| | | |
|---|---|---|
| ☐ 01 Automobile | ☐ 03 Destruction of Private Property | ☐ 05 Trespass |
| ☐ 02 Conversion | ☐ 04 Property Damage | ☐ 06 Traffic Adjudication |
| ☐ 07 Shoplifting, D.C. Code § 27-102 (a) | | |

### C. PERSONAL TORTS

| | | |
|---|---|---|
| ☐ 01 Abuse of Process | ☐ 09 Harassment | ☐ 17 Personal Injury- (Not Automobile, Not Malpractice) |
| ☐ 02 Alienation of Affection | ☐ 10 Invasion of Privacy | ☐ 18 Wrongful Death (Not Malpractice) |
| ☐ 03 Assault and Battery | ☐ 11 Libel and Slander | ☐ 19 Wrongful Eviction |
| ☐ 04 Automobile- Personal Injury | ☐ 12 Malicious Interference | ☐ 20 Friendly Suit |
| ☐ 05 Deceit (Misrepresentation) | ☐ 13 Malicious Prosecution | ☐ 21 Asbestos |
| ☐ 06 False Accusation | ☐ 14 Malpractice Legal | ☐ 22 Toxic/Mass Torts |
| ☐ 07 False Arrest | ☐ 15 Malpractice Medical (Including Wrongful Death) | ☐ 23 Tobacco |
| ☐ 08 Fraud | ☐ 16 Negligence- (Not Automobile, Not Malpractice) | ☐ 24 Lead Paint |

SEE REVERSE SIDE AND CHECK HERE ☑ IF USED

# Information Sheet, Continued

## C. OTHERS

- ☐ 01 Accounting
- ☐ 02 Att. Before Judgment
- ☐ 04 Condemnation (Emin. Domain)
- ☐ 05 Ejectment
- ☐ 07 Insurance/Subrogation
  Under $25,000 Pltf.
  Grants Consent
- ☐ 08 Quiet Title
- ☐ 09 Special Writ/Warrants
  (DC Code § 11-941)

- ☐ 10 T.R.O./ Injunction
- ☐ 11 Writ of Replevin
- ☐ 12 Enforce Mechanics Lien
- ☐ 16 Declaratory Judgment
- ☐ 17 Merit Personnel Act (OEA)
  (D.C. Code Title 1, Chapter 6)
- ☑ 18 Product Liability
- ☐ 24 Application to Confirm, Modify,
  Vacate Arbitration Award
  (DC Code § 16-4401)

- ☐ 25 Liens: Tax/Water Consent Granted
- ☐ 26 Insurance/ Subrogation
  Under $25,000 Consent Denied
- ☐ 27 Insurance/ Subrogation
  Over $25,000 Pltf. Grants Consent
- ☐ 28 Motion to Confirm Arbitration
  Award (Collection Cases Only)
- ☐ 29 Merit Personnel Act (OHR)
- ☐ 30 Liens: Tax/ Water Consent Denied
- ☐ 31 Housing Code Regulations
- ☐ 32 Qui Tam
- ☐ 33 Whistleblower
- ☐ 34 Insurance/Subrogation
  Over $25,000 Consent Denied

## II.

- ☐ 03 Change of Name
- ☐ 06 Foreign Judgment
- ☐ 13 Correction of Birth Certificate
- ☐ 14 Correction of Marriage
  Certificate

- ☐ 15 Libel of Information
- ☐ 19 Enter Administrative Order as
  Judgment [ D.C. Code §
  2-1802.03 (h) or 32-1519 (a)]
- ☐ 20 Master Meter (D.C. Code §
  42-3301, et seq.)

- ☐ 21 Petition for Subpoena
  [Rule 28-I (b)]
- ☐ 22 Release Mechanics Lien
- ☐ 23 Rule 27(a) (1)
  (Perpetuate Testimony)
- ☐ 24 Petition for Structured Settlement
- ☐ 25 Petition for Liquidation

_____
Attorney's Signature

9/19/2014
_____
Date

CV-496/Jun 13