**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| PAULA BROWNSTEIN,<br><br>                Plaintiff,<br><br>      v.<br><br>MERCK AND COMPANY,<br><br>                Defendant. | Civil Action No. 1:14-cv-01705-ABJ |

**<u>DEFENDANT'S OMNIBUS OPPOSITION TO PLAINTIFF'S MOTIONS *IN LIMINE*</u>**

      Defendant Merck and Company opposes Plaintiff's Motions in *Limine* as follows:

**OPPOSITION TO PLAINTIFF'S MOTION *IN LIMINE*
TO EXCLUDE OR LIMIT DEFENDANT'S USE OF FDA APPROVAL [DKT. 47]**

      The Food and Drug Administration consented to the sale of dienestrol, and Plaintiff never suggests that fact is irrelevant. Nor could she, as several courts have held that actions taken by the agency to permit a drug to be sold are relevant in lawsuits like this one. Instead, Plaintiff simply *assumes* that a jury will become confused by the differences between the modern-day approval process and the new drug application process that existed before 1962. Plaintiff's fears are unfounded. Counsel—aided by experts—can make clear what the differences are; indeed, Plaintiff was able to describe those differences in just a single page of briefing. The Court can then police any arguments about that process at the time of trial if it finds them unsupported. Merck intends to offer nothing more than an accurate description of how dienestrol came to the market with the FDA's agreement, and no limitations or jury instructions are necessary to address that. Thus, Plaintiff's Motion should be denied.

## I.  BACKGROUND

Plaintiff claims that while she was *in utero*, her mother ingested dienestrol that was manufactured by Defendant's predecessor, White Laboratories. Status Conf. Tr. 3:13-16, Mar. 8, 2017 (attached hereto as **Exhibit A**).  According to Plaintiff, her *in utero* exposure to White Laboratories' dienestrol caused her to be born with a T-shaped uterus, which left her unable to conceive or carry a child to term.  *Id.* 3:17-20.

As Plaintiff notes in her Motion, dienestrol was brought to the market in 1946 when a slightly different version of the Federal Food, Drug, and Cosmetic Act of 1938 ("FDCA") was in effect.  *See* Expert Rep. of Dena R. Hixon, M.D. ("Hixon Rep.") at 5 (attached as **Exhibit B**). That Act required manufacturers to submit a "new drug application" that would become effective—absent action from the FDA—within 60 days of its submission.  *Id.* at 5-6.  The application was meant to be comprehensive, containing (1) reports of investigations showing that the proposed drug was safe for its intended use, (2) a list of articles concerning the drug's components, (3) a statement describing the composition of the drug, (4) a description of the manufacturing, processing, and packaging methods, (5) drug samples, and (6) specimens of the proposed labelling.  *Id.*  The FDA could postpone the effective date of the application if it decided that more study or investigation was needed.  *Id.* at 6.  Alternatively, it could refuse to permit the application if it determined, under various criteria, that the drug could not be considered safe.  *Id*.  Thus, although the process at that time did not speak of "approval," the FDA had to, at a minimum, acquiesce in the sale of dienestrol.[1]  Nothing in the FDCA at the time

---

[1] For that reason, this process is sometimes still referred to as an "approval" process. *See, e.g.*, *USV Pharm. Corp. v. Sec'y of Health, Ed. & Welfare*, 466 F.2d 455, 456–57 (D.C. Cir. 1972) ("Under [the FDCA] drug approval was granted if the sponsor submitted proof establishing that the drug was safe for its intended use."); *accord Estate of Van Dyke v. GlaxoSmithKline,* No. 05-CV-153-J, 2009 WL 10671936, at *3 (D. Wyo. Mar. 27, 2009) ("The Act's most substantial innovation was its provision for premarket approval of new drugs.").

of White Laboratories' new drug application for dienestrol "assumed that the drug would be approved." Pl.'s Mot. at 2.

In 1962, Congress changed the drug approval process by enacting the Kefauver-Harris Amendments, Pub. L. No. 87-781, 76 Stat. 780 (1962). The Amendments changed the process to a system largely like the one in place today. Among other things, the Amendments required manufacturers to submit evidence of a proposed new drug's efficacy.[2] Hixon Rep. at 8; *see also U.S. ex rel. Conrad v. Abbott Labs., Inc.*, No. 02-11738-RWZ, 2013 WL 682740, at *1 (D. Mass. Feb. 25, 2013) ("The 1962 amendments thus created two classes of drugs relevant here: (1) drugs introduced between 1938 and 1962, which the FDA had approved only for safety, and (2) drugs introduced since 1962, which must be approved by the FDA for both safety and effectiveness."). The Amendments also removed the 60-day effective date for a new drug application and changed the standards applicable to new drug submissions. Hixon Rep. at 9; *see also Abigail All. for Better Access to Developmental Drugs v. von Eschenbach*, 495 F.3d 695, 725 (D.C. Cir. 2007) (Rogers, J., dissenting) (summarizing the changes made by the Amendments). Here again, though, Plaintiff misunderstands the import of the change. Although the Amendments permitted applications to be withdrawn, *see* Pl.'s Mot. at 2, that never happened as to dienestrol. In 1971, the drug was merely contraindicated for use in pregnancy based upon reports of clear cell adenocarcinoma of the vagina in women exposed *in utero* to diethylstilbestrol ("DES"), another synthetic estrogen.[3] *See* Hixon Rep. at 28-29; *see also* Pl.'s Mot., Ex. 1. It was then removed from the market voluntarily a short time later. Hixon Rep. at 30.

---

[2] As Merck has explained elsewhere, though, efficacy is not relevant to this particular suit. *See, e.g.*, Dkt. No. 41. So this change is likewise irrelevant.

[3] Should the Court deny Plaintiff's Motion, Plaintiff should not be allowed to challenge the FDA's action using the FDA's decision in 1971 to contraindicate dienestrol for use in pregnancy.

3

## II.  ARGUMENT

Time and again, courts have recognized the relevance of FDA action (or inaction) and a drug manufacturer's compliance with FDA standards. "FDA action or inaction, though not dispositive, may be considered to show whether a product is safe or not safe." *O'Neill v. Novartis Consumer Health, Inc.*, 55 Cal. Rptr. 3d 551, 557 (Cal. Ct. App. 2007). Indeed, in a failure-to-warn case like this one, another judge in this District has said that "compliance with federal regulations is most pertinent." *Brick v. Barnes-Hines Pharm. Co.*, 428 F. Supp. 496, 498 (D.D.C. 1977) (Gesell, J.). As Judge Weinstein (who quite literally wrote the book on torts) has explained, "the jury may be guided by the parties' experts as well as the more neutral expert opinion of the FDA." *In re Zyprexa Prods. Liab. Litig.*, 489 F. Supp. 2d 230, 281 (E.D.N.Y. 2007). And although "FDA approval is not tantamount to the standard of care," Pl.'s Mot. at 1, "FDA approval and industry practices may be relevant to the state duty of care." *Fulgenzi v. PLIVA, Inc.*, 711 F.3d 578, 589 (6th Cir. 2013); *accord Mazur v. Merck Co.*, 742 F. Supp. 239, 247 (E.D. Pa. 1990) ("[C]ompliance with an FDA regulation may establish that the manufacturer met the appropriate minimum standards of due care."). Thus, "other courts have used compliance with the FDA as proof of due care by a pharmaceutical company." *Mahaney v. Novartis Pharm. Corp.*, 835 F. Supp. 2d 299, 320-21 (W.D. Ky. 2011).

Massachusetts courts hold no differently. Although recognizing that it is "not conclusive on this issue," those courts have held that "[c]ompliance with FDA requirements [is] admissible to demonstrate lack of negligence." *MacDonald v. Ortho Pharm. Corp.*, 475 N.E.2d 65, 70-71 (Mass. 1985). That approach falls in line with the Restatement (Third) of Torts, which also recognizes that "a product's compliance with an applicable product safety statute or

---

Pl.'s Mot. at 1. As discussed elsewhere, such evidence is inadmissible under both Rule 402 and 403 because the FDA based its contraindication on reports of clear cell adenocarcinoma in women exposed *in utero* to DES, an injury that Plaintiff does not claim. Dkt. No. 40 at 6–7.

4

administrative regulation is properly considered in determining whether the product is defective." *Restatement (Third) of Torts: Products Liability* § 4(b) (Am. Law Inst. 1998); *see also generally Evans v. Lorillard Tobacco Co.*, 990 N.E.2d 997 (Mass. 2013) (relying extensively on the Third Restatement).

No case has held that FDA action or inaction becomes excludable merely because it occurred before 1962 under a slightly different regime. Plaintiff certainly summons no authority for that remarkable proposition, as there's no authority to be found in Plaintiff's entire Motion. The Third Circuit has found that evidence of compliance (or, in that case, non-compliance) under the former FDCA standards was "relevant to and should be admissible on the question of recklessness [the relevant standard in that case] on defendants' part." *Hoffman v. Sterling Drug, Inc.*, 485 F.2d 132, 145 n.43 (3d Cir. 1973); *see also Feldman v. Lederle Labs.*, 625 A.2d 1066, 1070 (N.J. 1993) (holding that a manufacturer's "attempt to comply with existing FDA regulations [in 1962 and 1963] still bears on the reasonableness of its conduct"). For good reason. Although the former regime did not require the FDA to make an affirmative, stated finding of safety and effectiveness, a drug could *not* be marketed if the FDA found it was unsafe. In other words, the FDA made a finding, implicit or otherwise, that dienestrol was not unsafe. And that finding is all that Merck wants to put before the jury.

Left with no real argument that this evidence is irrelevant, Plaintiff resorts to a half-hearted and ultimately unsuccessful Rule 403 argument. Here again, Plaintiff cites no authority for the notion that such evidence will confuse the issues or mislead the jury. Courts have admitted FDA standards evidence over Rule 403 objections before. *See, e.g.*, *Corrigan v. Methodist Hosp.*, 874 F. Supp. 657, 658 (E.D. Pa. 1995) (holding that "admission of the FDA regulatory status" of at-issue medical devices was not more prejudicial than probative).

Confusion and prejudice is especially unlikely here because witness testimony can accurately describe the process that applied to dienestrol. *See Chlopek v. Fed. Ins. Co.*, No. 05-C-545-S, 2006 WL 6040782, at *3 (W.D. Wis. June 21, 2006) ("Any concerns about the jury affording undue weight to the FDA approval were alleviated by the ability to present evidence concerning the scope of the underlying approval process."). Indeed, both Plaintiff and Merck intend to present expert testimony outlining the relevant FDA processes. *See* Hixon Rep. at 5-11; 19-30; Expert Rep. of Laura M. Plunkett, Ph.D., DABT at 6-7; 16-17 (attached as **Exhibit C**).

Merck has no intention of arguing that the FDA's decision to allow dienestrol's application to become effective is somehow decisive, or that the agency decided that dienestrol was "safe and effective" in the same way that it would under the present system. Indeed, Merck has already stipulated that it will not "offer[] evidence or argument that the FDA affirmatively recognized dienestrol as 'safe and effective.'" Dkt. No. 50.[4] If the Court nevertheless became concerned that the jury could afford Merck's FDA-related evidence undue weight, it could issue a narrow limiting instruction. The instruction would likewise apply to any FDA-related evidence that Plaintiff intends to offer.[5] *See, e.g.*, *In re Schering-Plough Corp. Intron/Temodar Consumer*

---

[4] Merck had offered to stipulate to more, including language explaining that FDA approval was not a complete bar to liability, but Plaintiff would not agree to reasonable language.

[5] Merck does not agree that Plaintiff would necessarily be entitled to present evidence "that shows the FDA relied on the drug manufacturer to provide full investigations of a new drug product and to submit the complete report to the FDA, which Defendant failed to do with Dienestrol." Pl.'s Mot. at 3. Such evidence could well be inadmissible under Rule 403 because it:

> . . . requires the jury to speculate as to what the FDA would have done with the safety information at issue. This is because compliance with the FDA reporting requirements may have reduced the risk that a Plaintiff would have been harmed only if one speculates as to what the FDA would have done with the information [the manufacturer] withheld from it. In other words, this evidence would be relevant to Plaintiffs' state-law claims only if the jury speculates that the FDA

*Class Action*, No. 2:06-cv-5774 (SRC), 2009 WL 2043604, at *13 (D.N.J. July 10, 2009) ("Plaintiffs' allegations of insufficient evidence and lack of FDA approval . . . fail to assert that the Subject Drugs were ineffective, unsafe, or somehow worth less than what Plaintiffs paid for the drugs."); *Holland v. Smith & Nephew Richards, Inc.*, 100 F. Supp. 2d 53, 56 (D. Mass. 1999) ("[T]hat FDA has not cleared a product for a particular use does not mean that [it] is not in fact suitable for that purpose[.]"); *Sita v. Danek Medical, Inc.*, 43 F. Supp. 2d 245, 257 (E.D.N.Y. 1999) ("The fact that a [product] has not been approved by the FDA for a particular use does not, however, mean that [it] is unsafe, much less that the device is defective."); *McMurdie v. Wyeth*, 71 Pa. D. & C. 4th 225 (Com. Pl. 2005) ("[The] mere fact that the FDA has not cleared a product for a particular use does not mean that the product is not in fact suitable for that purpose." (internal marks omitted)); *see also Bristol-Myers Co. v. F.T.C.*, 738 F.2d 554, 559 (2d Cir. 1984) ("[T]he FDA regulatory scheme simply provides a low threshold for withdrawal of a drug on safety grounds.").

### III.  CONCLUSION

For these reasons, Merck and Company requests that the Court deny Plaintiff's Motion *in Limine* to Exclude or Limit Defendant's Use of FDA Approval (Dkt. No. 47).

### OPPOSITION TO PLAINTIFF'S MOTION *IN LIMINE* REGARDING PLAINTIFF'S COUNSEL'S DES ACTIVITIES [DKT. 48]

Plaintiff's request to preclude Merck from introducing evidence of circumstances that might explain why this case was brought as a dienestrol case against Merck when all of the

---

would have somehow passed the safety information on to Plaintiff[] or [her] prescribing physicians or would have required [the manufacturer] to change its label [or otherwise rejected the application].

*In re Trasylol Prods. Liab. Litig.*, 763 F. Supp. 2d 1312, 1330 (S.D. Fla. 2010).

7

pertinent medical records identify a different medicine – DES – can be fairly characterized with one word – chutzpah. For the reasons outlined below, the Motion must be denied.

## I.   BACKGROUND

Whether Plaintiff's mother was prescribed, and Plaintiff was exposed to dienestrol or DES, is a major issue in this case.[6] It is the most important issue because if Plaintiff was not exposed to dienestrol, Merck could have no potential liability regardless of the significant arguments about causation and damages. Merck did manufacture DES, but Merck had ceased manufacturing and distribution of DES more than three years before Plaintiff and her mother were exposed so if this case had been brought as a DES case Merck would not have been a proper defendant.

All of plaintiff's medical records that refer to exposure to synthetic estrogen refer to "DES exposure." *Id.* 6:16-19. Plaintiff's sole evidence that purports to show she was exposed to White Laboratories' dienestrol comes from the unsupported testimony of her mother, which was first provided in the form of an affidavit and later during the mother's deposition. Plaintiff's mother testified that her doctor "prescribed DES" to her, and that she filled her "DES prescription" at Dean Pharmacy in suburban Boston. B. Brownstein Aff. ¶¶ 5-6, Sept. 18, 2014 (attached as **Exhibit D**); B. Brownstein Dep. 40:21-41:9, 75:12-17, Apr. 8, 2015 (attached as **Exhibit E**). As the parties are well aware, at the time of Plaintiff's mother's exposure in Boston, Lilly dominated the DES market with over 90% market share.

Plaintiff's mother also testified that the name "Dienestrol" was written on the pharmacy bottle for the medication she took while pregnant with Plaintiff and her affidavit included a description of the pill that is not inconsistent with the description of the 10 mg White

---

[6] Merck contests many of Plaintiff's allegations about dienestrol, as discussed in Defendant's Motion *in Limine* No. 6 to Preclude References to Injuries Allegedly Caused by Exposure to DES or Dienestrol Other Than the Injury Claimed by Plaintiff.

Laboratories' dienestrol and referred to a picture that purported to show a White Laboratories' dienestrol pill next to a Bayer aspirin. *See* B. Brownstein Aff. ¶¶ 6-7, 9; B. Brownstein Dep. 41:4-14, 41:21-42:3, 44:22-45:4; Photograph of Pill Considered by B. Brownstein (attached as **Exhibit F**). At her deposition, Plaintiff's mother testified that she first saw this affidavit when she received it by mail in California. B. Brownstein Dep. 38:6-13. At her deposition, Plaintiff's mother did not recognize the signature of the witness on her affidavit, Plaintiff's counsel, Mr. Levine, and she did not know how both she and Mr. Levine signed her affidavit on the same day because she was not with him personally that day and sent her signature back in hard copy via mail. *Id.* 37:7-38:2.

At the time of Plaintiff's mother's product use, it would have been illegal for the pharmacist to fill a prescription for DES with another product, including dienestrol, without obtaining permission from the prescribing physician. Plunkett Dep. 90:22-92:5, Jan. 28, 2016 (attached as **Exhibit G**); Hermes-DeSantis Dep. 9:21-10:6, Feb. 4, 2016 (attached as **Exhibit H**). Plaintiff has no evidence from the pharmacy or the prescribing physician to suggest that a request for substitution was made and approved, and there are no records from the pharmacy to confirm what medicine was dispensed to her mother based on the DES prescription. Not surprisingly, these facts raised a few eyebrows on the defense side. As this Court has stated: "this entire case boils down to what plaintiff's mother was prescribed and what drug plaintiff was exposed to in utero." Status Confr. Tr. 33:20-22.

Merck first became aware of Plaintiff's counsel's DES-related side agreements in April 2015, when he offered for inspection certain documents responsive to Merck's requests for production. Email from B. Levine to B. Silverstein, Apr. 20, 2015 (attached as **Exhibit L**). The day before that review, Plaintiff's counsel emailed Merck's counsel stating, "Please be advised

9

that some of the documents are protected by a confidentiality agreement between our office and Eli Lilly and Company but we will visit that issue and those documents tomorrow." *Id.* When Merck's counsel arrived at Plaintiff's counsel's office, Mr. Levine informed her that he had an agreement with the DES manufacturers that required him to discard all of his filings and literature related to DES. Silverstein Decl. ¶ 3 (attached as **Exhibit J**). Mr. Levine then explained that he recently realized that he had not discarded all of the literature. *Id.* ¶ 3. Because he believed it was responsive to Merck's document requests, he proposed to allow Merck's counsel to review the documents, but he would only do so on the condition that Merck's counsel not disclose to counsel for Eli Lilly that Mr. Levine had retained the documents. *Id.* ¶ 3. Merck's counsel informed Mr. Levine that Merck could not agree. *Id.* ¶ 4. After some initial resistance, Mr. Levine eventually allowed Merck's counsel to review the documents without a vow of silence from Merck's counsel. *Id.* ¶ 5.

In April 2016, the parties to this lawsuit were sitting in Judge Harvey's courtroom awaiting the judge's arrival for the court-ordered mediation; Merck's outside counsel (Ms. Hilgendorff and Ms. Silverstein), Plaintiff's counsel (Mr. Levine and Mr. Malone), Merck's in-house counsel, and Plaintiff were all there. *Id.* ¶ 6. As the parties were making small talk, Mr. Levine stated—unsolicited—that, in prior DES litigation, he had agreed to never again sue "the DES manufacturers." *Id.* ¶ 8. Mr. Levine also recounted an instance when another plaintiff's attorney had a Mother who was adamant that the DES pill she'd taken was green, but because there was no such thing as a "green" DES pill the attorney persuaded the witness that she had actually taken a red pill. *Id.* ¶ 7. Neither Merck's outside counsel nor in-house counsel engaged in conversation with Mr. Levine regarding either of these topics. *Id.* ¶ 9. This idle chatter by

10

Plaintiff's counsel only reinforced the existing skepticism of Merck and defense counsel about the assertion that Plaintiff's mother was exposed to dienestrol.

The agreement came up again on summary judgment. In May 2016, Merck moved for summary judgment, arguing (among other things) that the evidence established that Plaintiff was exposed to DES, not dienestrol. Def.'s Mem. in Support of Mot. for Summ. J. (Dkt. No. 27) at 12-16. In response, Plaintiff's counsel wrote that Plaintiff could have sued DES manufacturers—and rhetorically asked why she would go to the trouble of suing a dienestrol manufacturer if she weren't telling the truth. Dkt. No. 28-1 at 16, 21 ("If Plaintiff's mother was conspiring with Plaintiff's lawyer, why invent Dienestrol when inventing DES would have been so much more convenient?"). Of course, Plaintiff's counsel's agreement provides an answer to this question. In reply, Merck informed the Court that it knew "a reason" why Plaintiff's counsel would not have sued the DES manufacturers. It suggested that the Court ask Mr. Levine to provide details. Dkt. No. 29 at 18-19.

Plaintiff's counsel continued to raise the issue of his DES agreements. In particular, after summary judgment briefing, Plaintiff's counsel wrote to Merck's counsel demanding that Merck rescind the statements in its reply brief. Ltr. from A. Levine to B. Silverstein, July 20, 2016 (attached as **Exhibit I**). Merck responded that it would not rescind its valid argument. Plaintiff had put Mr. Levine's Never-To-Sue-DES-Manufacturers-Again agreement at issue by representing to this Court that she had no reason not to sue DES manufacturers, and Plaintiff's counsel had himself touted his agreement never to again sue the DES manufacturers. Ltr. from B. Silverstein to A. Levine, July 25, 2016 (attached as **Exhibit K**). Plaintiff's counsel never responded.

And now Plaintiff has brought the current Motion seeking to preclude Merck from replying to Plaintiff's rhetorical argument that if it should have been a DES case, it would have been brought as such by introducing evidence challenging the credibility of that argument.

## II. ARGUMENT

Plaintiff's counsel's agreement not to sue the DES manufacturers is highly probative of whether Plaintiff's mother actually ingested dienestrol. Settlement agreements and the like can shape a party's motives and influence their testimony. Unsurprisingly, then, courts will often admit them. *See, e.g.*, *Tanner v. Johnston*, No. 2:11-CV-00028-TS-DBP, 2013 WL 121158, at *5 (D. Utah Jan. 8, 2013) (deeming evidence of settlement agreements relevant where it went to the "potential bias, interest and credibility" of witnesses); *ABN AMRO, Inc. v. Capital Int'l Ltd.*, No. 04 C 3123, 2006 WL 6898001, at *3 (N.D. Ill. Jan. 30, 2006) ("[S]ettlement terms and agreements may be relevant for the purpose of proving the bias or prejudice of a witness."); *Tribune Co. v. Purcigliotti*, No. 93 CIV. 7222(LAP)(THK), 1996 WL 337277, at *2 (S.D.N.Y. June 19, 1996) (explaining that a settlement agreement was relevant and admissible when it went to a witness's motivation for providing particular testimony).

Plaintiff's counsel's agreement goes directly to the credibility of key product identification testimony. On summary judgment, this Court suggested that "this entire case boils down to what drug plaintiff's mother was prescribed and what drug plaintiff was exposed to in utero." Status Conf. Tr. 33:20-23. Merck has no choice but to offer evidence and argument that Plaintiff's mother was prescribed, and Plaintiff was exposed to, DES, not dienestrol, and that there is substantial motive for mom's testimony otherwise. Def.'s Mem. in Support of Mot. for Summ. J. (Dkt. No. 27) at 12-16. Given that Plaintiff will evidently suggest to the jury or offer evidence and argument questioning why Plaintiff would not have sued the DES manufacturers, and, specifically, questioning why Plaintiff's mother would conspire with Plaintiff's lawyer to

"invent Dienestrol when inventing DES would have been so much more convenient," such evidence is relevant and admissible." Dkt. 28-1 at 16, 21. Plaintiff's counsel's DES side agreement provides an answer to Plaintiff's doubt-raising question. Thus, Plaintiff's counsel's agreement not to sue the DES manufacturers is relevant to the issues in this case. Having opened the door to this issue with a rhetorical question, Plaintiff cannot reasonably expect this Court to preclude Merck from providing the answer – an answer Plaintiff's counsel provided directly to Merck and its counsel.

The potential prejudice of this evidence, if any, is not outweighed by the highly probative value of this evidence to the jury. Plaintiff's counsel cannot have it both ways. He cannot brag about an agreement not to sue DES manufacturers (and tell a story regarding another case where another plaintiff's attorney influenced the product identification testimony) in front of a room full of lawyers (and his own client) and argue that that Plaintiff could have just as easily sued DES manufacturers without fear of contradiction, while at the same time claim that the information is too prejudicial for the jury to hear. Merck should be permitted to present information gleaned from his own statements, especially given that Plaintiff has not articulated any concrete prejudice that would result from it. If Plaintiff's counsel is now inclined to assert that such an agreement was never made and therefore had no impact on this matter, he can argue those points before the jury.

*Hayes v. Sebelius*, cited to by Plaintiff (Dkt. 48 at 2), does not require a different result. 806 F. Supp. 2d 141, 143 (D.D.C. 2011). That case decided a variety of *in limine* motions in an employment discrimination case.[7] *Id.* One motion concerned evidence relating to a lawsuit filed by another employee. *Id.* at 144. The Court precluded the plaintiff from offering that evidence

---

[7] Although Plaintiff failed to indicate which ruling she believes is relevant to this case, only two of the rulings relate to prior litigation and settlement agreements.

under case law specific to employment discrimination cases. *Id.* at 144-45. In response to another motion, the Court also precluded the plaintiff from presenting some evidence of his prior settlements in employment discrimination cases. *Id.* at 148.

None of the rulings in *Hayes* are applicable to this case. First, this is not an employment discrimination case, so an employment-related test simply doesn't apply here. More importantly, the facts in *Hayes* are in no way analogous to the facts here. *Hayes* did not involve an agreement where counsel agreed not to sue certain other defendants—so *Hayes* did not consider whether settlements would be relevant to a key issue in this case, product identification. Rather, the Court in *Hayes* was animated by the concern that prior litigation and settlements would smear the defendant as a repeat offender; the jury would then punish the defendant for its prior misdeeds (rather than deciding the matter actually at issue). Properly understood, then, nothing in *Hayes* indicates that evidence regarding Plaintiff's counsel's agreement with DES manufacturers is either irrelevant or prejudicial.[8]

## III. CONCLUSION

Plaintiff's counsel brought this case against Merck as a dienestrol case. Plaintiff's mother's signed an affidavit, drafted by Mr. Levine, in California purporting to identify the medication at issue in this case. That very same day, Mr. Levine attested that he had witnessed that signature even though he was in another state. He regaled Merck and its counsel with his agreement not to bring further DES cases and an unashamed tale of a fellow plaintiff's lawyer's persuasion of testimony on the product identification of DES. Without citing any of this, Merck moved for summary judgment, citing the many other reasons this case should fail. In opposing

---

[8] Consistent with Defendant's Motion *in Limine* No. 11 to Prohibit References to or Evidence of Prior Litigation (Dkt. No. 45), if this Motion is denied, Merck will refrain from discussing the fact that Mr. Levine's agreement stems from a prior DES litigation.

that motion, Plaintiff rhetorically asked why in the world this would be brought as a dienestrol case if it was really a DES case – opening the door to his own admissions. And now Plaintiff asks the Court to close the door and preclude Merck from providing the answer to that rhetorical question at trial. While Plaintiff's counsel's chutzpah cannot be questioned, Plaintiff's Motion must be denied. For the foregoing reasons, Merck and Company requests that the Court deny Plaintiff's Motion *in Limine* Regarding Plaintiff's Counsel's DES Activities (Dkt. No. 48).

Dated: July 14, 2017                    Respectfully submitted,

                                         */s/ Brianna Lynn Silverstein*
                                        Thomas F. Campion (admitted *pro hac vice*)
                                        Heidi E. Hilgendorff (admitted *pro hac vice*)
                                        DRINKER BIDDLE & REATH LLP
                                        600 Campus Dr.
                                        Florham Park, NJ 07932-1047
                                        Tele: (973) 549-7000
                                        Thomas.Campion@dbr.com
                                        Heidi.Hilgendorff@dbr.com

                                        Cheryl A. Bush (admitted *pro hac vice*)
                                        Michael R. Williams (#994953)
                                        BUSH SEYFERTH & PAIGE PLLC
                                        3001 West Big Beaver Road, Suite 600
                                        Troy, MI 48084
                                        Tele: (248) 822-7801
                                        Bush@bsplaw.com
                                        Williams@bsplaw.com

                                        Brianna Lynn Silverstein (#997831)
                                        DRINKER BIDDLE & REATH LLP
                                        1500 K Street, N.W., Suite 1100
                                        Washington, D.C. 20005-1209
                                        Tele: (202) 230-5136
                                        Brianna.Silverstein@dbr.com

                                        *Counsel for Defendant Merck and Company*

## CERTIFICATE OF SERVICE

I hereby certify that on July 14, 2017, a true and correct copy of the foregoing document was filed via the CM/ECF system, which will send a notice (NEF) to all registered users who have entered an appearance in this case.

*/s/ Brianna Lynn Silverstein*
Brianna Lynn Silverstein
