# EXHIBIT B

# Paula Brownstein v. Merck and Company
# Regulatory Expert Statement of Dena R. Hixon, MD[1]
### November 23, 2015

## BACKGROUND AND QUALIFICATIONS

Medical Training and Clinical Experience

I am a licensed medical doctor in the state of Maryland, with an M.D. degree from the University of Maryland School of Medicine. I completed residency training in Family Practice and received Board Certification from the American Academy of Family Practice. I also completed residency training in Obstetrics and Gynecology and received Board Certification from the American Board of Obstetrics and Gynecology. I have 13 years of clinical practice experience as an obstetrician/ gynecologist. During my medical training and clinical practice, I gained knowledge and experience with the common use of estrogen products, including awareness that young women exposed to diethylstilbestrol (stilbestrol, or DES) or related products in utero may be at increased risk of cervical or vaginal adenosis, clear cell adenocarcinoma, and certain anomalies of the vagina, cervix, and/or uterus associated with incompetent cervix, premature labor, and pregnancy loss. I am very familiar with the risks and benefits of hormone therapy in contraception, menstrual disorders, infertility, management of menopausal symptoms and osteoporosis prevention.

FDA Regulatory Experience

For nearly 13 years (January 1999 to November 2011), I was a Medical Officer in the United States Food and Drug Administration (FDA) Center for Drug Evaluation and Research (CDER). I served as a primary reviewer and team leader in the Office of New Drugs (OND), Division of Reproductive and Urologic Drug Products (DRUDP). There I reviewed and evaluated clinically relevant information regarding the safety and efficacy of drug products, including estrogen products intended for treatment of postmenopausal women and estrogen-containing contraceptive products. I later became the Associate Director for Medical Affairs in the Office of Generic Drugs and evaluated a broad range of drug products used in many different clinical fields.

During my service at FDA, I reviewed Investigational New Drug (IND) applications and New Drug Applications (NDAs) for drug products. I reviewed INDs to ensure reasonable evidence of safety for studies in humans. I reviewed protocol proposals to ensure that the proposed studies were reasonably safe and adequately designed to achieve their objectives. I also reviewed NDAs

---

[1] I work as the sole member of Pharmaceutical Lifecycle Consulting, LLC, a Maryland single member limited liability company, established in December 2011.

for adequate evidence of safety and efficacy to meet standards for marketing approval, and I reviewed postmarketing labeling proposals, safety reports, and supplemental applications for new indications and/or for labeling changes.

As a team leader, I trained other medical officers and evaluated their work. I also considered the reviews of all relevant disciplines and made recommendations on approval of new drug applications and various efficacy or labeling supplements, ensuring adequate evidence of safety and efficacy and maintaining consistency between products and manufacturers.

I have conducted and/or participated in numerous meetings between FDA and industry sponsors, including pre-IND meetings, end-of-phase 2 meetings, pre-NDA meetings, and other guidance meetings, providing advice and feedback to companies regarding study design, endpoints and/or acceptability of outcome information.

My work in CDER also included participating in a number of inter-office committees and working groups including the Pregnancy Labeling Task Force, the CDER Pediatric Review Committee (PeRC)[2], the CDER Pediatric Exclusivity Board, and the FDA Drug Safety Oversight Board, which was mandated by law in the FDA Amendments Act of 2007 to advise the CDER Center Director on the handling and communicating of important and often emerging drug safety issues.[3]

I served as an instructor for CDER reviewers at internal FDA conferences, presenting the roles of the Medical Officer in the drug review process on numerous occasions. I presented clinical considerations in generic drug development to the Office of Generic Drugs and to CDER training conferences on numerous occasions. I also participated in CDER Scientific Rounds on numerous occasions as a presenter and/or panelist.

In addition, I gave presentations at public conferences, presenting the CDER review process to the CDER Forum for International Drug Regulatory Authorities, and presenting various clinical considerations in generic drug development and review at the Annual Generic Pharmaceutical Association Fall Technical Conferences.

My work at FDA involved extensive review of the development and review process for many approved products, including some that were approved prior to the implementation of current regulations and guidances. I am fully aware of the evolution of drug regulations and FDA

---

[2] Letter from Janet Woodcock to Andrew von Eschenbach, October 23, 2007, establishing the Pediatric Review Committee:
http://www.fda.gov/downloads/Drugs/DevelopmentApprovalProcess/DevelopmentResources/UCM049871.pdf
[3] FDA: Drug Safety Oversight Board, updated December 15, 2014:
http://www.fda.gov/AboutFDA/CentersOffices/OfficeofMedicalProductsandTobacco/CDER/ucm082129.htm

policies and procedures over time, as well as the vast increase in experience and knowledge of methods for evaluating drug safety and effectiveness.

Materials Reviewed, and Compensation

My current Curriculum Vitae and a list of the documents I have reviewed in preparing this statement are attached. I have reviewed documents from the NDA submitted for marketing of White Laboratories' dienestrol, related FDA regulations, and FDA communications with the company.   I have also reviewed relevant information in textbooks, literature reports, and publications related to the risks of and clinical considerations for pregnancy loss and consequences of treating pregnant women with dienestrol or the related product stilbestrol (diethylstilbestrol, DES) to prevent pregnancy loss, as well as reports of plaintiffs' experts relevant to regulatory matters. I have also relied upon the relevant laws and regulations regarding drug development and regulation in the United States. Throughout this report, specific sources of information are indicated in footnotes.

I have been compensated at a rate of $600 per hour for reviewing materials and creating this report. My fees are the same for deposition and trial testimony.

List of cases in which I have testified in the last 4 years:

> In Re Topamax Litigation
> Court of Common Pleas, Philadelphia County
> Deposition May 1, 2013

> Czimmer v. Janssen Pharmaceuticals
> In The Court Of Common Pleas, First Judicial District Of Pennsylvania, Civil Trial Division
> Court Testimony October 28-29, 2013

> Powell v. Janssen Pharmaceuticals
> In The Court Of Common Pleas, First Judicial District Of Pennsylvania, Civil Trial Division
> Court Testimony November 12-13, 2013

> Anderson v. Janssen Pharmaceuticals
> In The Court Of Common Pleas, First Judicial District Of Pennsylvania, Civil Trial Division
> Court Testimony February 25-26, 2014

> Royal v. Novartis Pharmaceuticals Corporation

Deposition June 19, 2014
Circuit Court of Cook County, Illinois

In Re Mirena Litigation
Deposition September 22, 2015
United States District Court Southern District Of New York and
Superior Court Of New Jersey Law Division, Bergen County

Basis for Opinions

My opinions set forth in this report are expressed to a reasonable degree of medical and scientific certainty. In forming my opinions, I have relied upon my knowledge of the FDA regulations, policies and procedures as well as my own training and clinical experience as an obstetrician/ gynecologist providing women's health care and my experience at FDA as a medical officer and regulatory reviewer of women's healthcare products.

I have reviewed NDA documents for dienestrol and correspondences between the FDA and the relevant drug companies. I have reviewed published literature relevant to DES and related products, and a suspected association between in utero exposure of female fetuses to such drugs and the occurrence of uterine anomalies and reproductive failure. I have also reviewed the rules and regulations regarding new drug applications and regulations at the time of the White Laboratories dienestrol NDA submission and review. The following discussion relates to the regulatory authority of FDA, the general requirements for registering a new drug product in 1946 in comparison to later standards, and to the development, approval, labeling, and postmarketing safety reporting for dienestrol in particular.

## BRIEF SUMMARY OF THE ISSUES

I understand that a personal injury law suit has been filed against Merck & Co. ("Merck"), as the successor corporation to White Laboratories, who submitted a New Drug Application (NDA) for dienestrol, a synthetic estrogen drug used initially in 1946 for menopausal syndrome and suppression of lactation, and later used in 1950 in higher doses for symptomatic treatment of cancer, treatment of functional uterine bleeding, and for treatment of habitual and threatened abortion in pregnant women. The plaintiff alleges that Merck and its predecessors failed to adequately warn her mother or her health care provider(s) that dienestrol can cause uterine anomalies and pregnancy failure in the offspring of women exposed to the drug during pregnancy.

4

## REGULATORY FRAMEWORK

<u>Authority of the FDA in the Development and Regulation of Drugs</u>
FDA is an agency of the United States government, currently in the Department of Health and Human Services (DHHS). It is responsible for protecting the public health by assuring the safety, effectiveness, quality, and security of human and veterinary drugs, vaccines and other biological products, and medical devices. The FDA is also responsible for the safety and security of most of our nation's food supply, cosmetics, dietary supplements and products that give off radiation, and for the regulation of tobacco products. Six Centers in FDA regulate products in these categories, including the Center for Drug Evaluation and Research (CDER),[4,5] the center that ensures that safe and effective drugs are available to improve the health of people in the United States.[6]

The Food and Drug Administration is the oldest comprehensive consumer protection agency in the U.S. federal government. It began around 1848 when Lewis Caleb Beck was appointed to the Patent Office to carry out chemical analyses of agricultural products, a function assigned to the new Department of Agriculture in 1862. FDA's modern regulatory functions began with the passage of the 1906 Pure Food and Drugs Act (its name since 1930), which prohibited interstate commerce in adulterated and misbranded food and drugs, thereby providing basic elements of protection that consumers had never known before that time.[7] The Food, Drug and Cosmetic (FD&C) Act was implemented in 1938, and as amended, still largely governs the responsibilities of FDA in regulating drugs. As codified in Title 21 of the Code of Federal Regulations (21 CFR), this act requires manufacturers to demonstrate the safety of drug products prior to marketing approval. It was not until 1962 that the Kefauver-Harris Amendment to the FD&C Act was added, requiring that manufacturers provide evidence of both safety and efficacy prior to marketing approval.[8]

<u>Regulations for Drug Development and Approval in 1946</u>
When White Laboratories, Inc.'s New Drug Application, NDA #5991, for dienestrol tablets was submitted to FDA in 1946, the 1938 FD&C Act was in effect. Section 505(a) of the Act applies to New Drugs, requiring that an application be in effect for any new drug before it is entered into interstate commerce. Section 505(b) specifies the required contents of the application including the following:

1. Full reports of investigations which have been made to show whether or not such drug is safe for use

---

[4] FDA Organization, updated February 25, 2015 http://www.fda.gov/AboutFDA/CentersOffices/default.htm
[5] About FDA: What We Do, updated August 5, 2014 http://www.fda.gov/AboutFDA/WhatWeDo/default.htm
[6] About the Center for Drug Evaluation and Research, updated December 9, 2014 http://www.fda.gov/AboutFDA/CentersOffices/OfficeofMedicalProductsandTobacco/CDER/default.htm
[7] About FDA: History, updated March 23, 2015 http://www.fda.gov/AboutFDA/WhatWeDo/History/default.htm
[8]; FDA History Part III: Drugs and Foods under the 1938 Act and Its Amendments, updated June 18,2009 http://www.fda.gov/AboutFDA/WhatWeDo/History/Origin/ucm055118.htm

2. A full list of the articles used as components of such drug
3. A full statement of the composition of such drug
4. A full description of the methods used in, and the facilities and controls used for, the manufacture, processing, and packing of such drug
5. Such samples of such drug and of the articles used as components thereof as the Secretary may require
6. Specimens of the labeling proposed to be used for such drug.[9]

The 1938 Act did not discuss an "approval" process but instead refers to an "effective" application as follows: The application is to become effective on the 60th day after filing unless prior to such day the FDA postpones the effective date to such time (not more than 180 days after filing) as deemed necessary to enable the study and investigation of the application.[10]

FDA shall issue an order refusing to permit the application to become effective if the investigations "do not include adequate tests by all methods reasonably applicable to show whether or not such drug is safe for use under the conditions prescribed, recommended, or suggested in the proposed labeling thereof" or if the results show the drug is unsafe or do not show that it is safe for such use; if the facilities and controls are inadequate to preserve the identity, strength, quality, and purity of the product; or there is insufficient information to determine whether such drug is safe for use under such conditions.[11] Section 505(e) provides for the effectiveness of an application to be suspended if clinical experience, new test methods, or methods not deemed reasonably applicable when the application became effective show that the drug is unsafe under the conditions of use, or if the application contains any untrue statement of a material fact.[12]

Chapter III of the Act addressed Prohibited Acts and Penalties, including misbranding, adulteration, refusal to permit access to records or refusal to permit entry for inspection, giving a false guarantee, forging, counterfeiting, simulating, or falsely representing any required identification, or alteration, mutilation, destruction, obliteration or removal of a label.[13] Penalties including injunction proceedings, financial penalties, seizure, and hearings before criminal violation are also discussed in Chapter III.[14].

Regulations for the enforcement of the FD&C Act were published in the Code of Federal Regulations, Title 21 (21 CFR), Part 2, in 1940, the same year that FDA was transferred from the Department of Agriculture to the Federal Security Agency. The Regulations for Drugs and

---

[9] FD&C Act, 75th Congress, 3d session, Public Laws Chapter 675, June 25, 1938. Section 505(a) and(b)
[10] FD&C Act, 75th Congress, 3d session, Public Laws Chapter 675, June 25, 1938. Section 505(c)
[11] FD&C Act, 75th Congress, 3d session, Public Laws Chapter 675, June 25, 1938. Section 505(d)
[12] FD&C Act, 75th Congress, 3d session, Public Laws Chapter 675, June 25, 1938. Section 505(e)
[13] FD&C Act, 75th Congress, 3d session, Public Laws Chapter 675, June 25, 1938. Section 301.
[14] FD&C Act, 75th Congress, 3d session, Public Laws Chapter 675, June 25, 1938. Sections 302, 303, 304, and 305

Devices[15] required all information to be complete, including submission of 2 copies of the application, before filing of the application by FDA.

On September 8, 1955[16] and May 30, 1956,[17] Proposed Rules were posted in the Federal Register, proposing to repeal sections 1.109-1.114 and to replace them with a new Part 130 designated for New Drugs. In section 130.4, Applications, a new form was required for submission of an NDA, including the required components from section 505(b) of the FD&C Act. Although apparently not required by regulation in 1946, a similar form (Form FD 356 (revised)) was used by White Laboratories for submission of NDA #5991 for dienestrol.[18]

The Act and regulations in 1946, when NDA #5991 was submitted, did not define "adequate tests" or "all methods reasonably applicable," and therefore left it to the FDA to use its judgment in evaluating each application. Of note, the FDA Form-356 submitted by White Laboratories includes the following regarding the studies submitted:
>    (1) Full reports of all investigations which have been made to show whether or not the drug is safe for use.
>    (These reports should include, *where necessary* [emphasis added], detailed data derived from appropriate animal or other biological experiments in which the methods used and the results obtained are clearly set forth. Furthermore, reports of all clinical tests by experts, qualified by scientific training and experience to evaluate the safety of drugs, should be attached and should include statements of the conditions treated, the number of persons treated, the dosage, frequency, and duration of administration of the drug, and a full statement of any adverse effects and therapeutic results observed.)[19]

Of great significance to the history of drug regulation, there was no requirement for a company to demonstrate effectiveness of its products between the passing of the FD&C Act in 1938 and the Kefauver-Harris Amendment in 1962. The more-detailed requirements for NDA submission set forth in the proposed rules mentioned above were included in the 1962 amendments,[20] and the Final Rule for Part 130 was posted on June 20, 1963, with implementation of these amendments.[21]

Dr. Walton Van Winkle Jr., a member of the FDA, wrote the article "Laboratory and Clinical Appraisal of New Drugs" in a Report of the Council on Pharmacy and Chemistry, published in the Journal of the American Medical Association (JAMA) in 1944. The report includes an

---

[15] 21 CFR Sections 2.100 to 2.111
[16] 20 FR 6584, September 8, 1955
[17] 21 FR 3689, May 30, 1956
[18] MRKDEN:001324
[19] MRKDEN:001324
[20] Public Law 87-781, October 10, 1962
[21] 28 FR No. 120, 6377-6385, June 20, 1963

introductory statement by Austin Smith, the Secretary of the Council, that "this report is offered as an objective, a pattern and not a regulation. However, it has been adopted for publication with the belief that it will be of help to manufacturers and scientists who undertake the investigation of new drugs." [22]   This is contrary to the suggestion by Plaintiff's expert Laura Plunkett, that it sets forth a regulatory standard for that time period.

Dr. Van Winkle noted that the FDA was concerned primarily with evidence of safety, whereas the Council on Pharmacy and Chemistry was concerned also with the evidence to support claims made for new drugs. He outlined the principles that had been helpful in appraising the therapeutic usefulness and potential harm of new drugs, outlining the methods into a logical system that would give reasonable assurance that the new product would not be offered to the medical profession or to the public before the extent of its usefulness and potential harm are understood. He proposed that preliminary experimental observations should include tests of the possible pharmacodynamic actions of the drug, followed by more extensive tests of the mechanisms of action and toxicity, and then acute and chronic toxicity studies in several species of animals, with additional local effects and special studies, depending upon the conditions for which the product may be used. Human studies would be conducted only following a critical review of the accumulated data and would include observations of an appropriate control group. The results would be carefully analyzed with consideration for the conditions to be treated, effectiveness, comparison to other drugs and methods of treatment, toxicity, and therapeutic advantages.[23]   Indeed, these principles have proven useful over the years and have been incorporated into later regulations and procedures for drug development and review.   However, at the time of the dienestrol application review and marketing, they were not a part of the requirements for evaluation of new drugs, including dienestrol.

The Kefauver-Harris "Drug Amendments of 1962" were enacted on October 10, 1962 "To Assure Safety, Effectiveness, and Reliability" of drugs. These amendments added a requirement for "substantial evidence that the drug will have the effect it purports or is represented to have under the conditions of use prescribed, recommended, or suggested in the proposed labeling thereof." Further, "the term 'substantial evidence' means evidence consisting of adequate and well-controlled investigations, including clinical investigations, by experts qualified by scientific training and experience to evaluate the effectiveness of the drug involved, on the basis of which it could fairly and responsibly be concluded by such experts that the drug will have the effect it purports or is represented to have under the conditions of use prescribed, recommended, or suggested in the labeling or proposed labeling thereof."[24]

---

[22] W Nan Winkle, et al, Laboratory and Clinical Appraisal of New Drugs, JAMA Vol. 126, No. 15, Dec 9, 1944.
[23] W Van Winkle, et al, Laboratory and Clinical Appraisal of New Drugs, JAMA Vol. 126, No. 15, Dec 9, 1944.
[24] Public Law 87-781, October 10, 1962,Sec. 102 (c)

The 60-day default for an "effective application" under the 1938 act was removed, and new drugs were required to have prior approval from the FDA to go to market. An application that was "effective" on the day immediately preceding the enactment date of the 1962 amendments was deemed to be an application "approved" within the meaning of the Act as amended.[25] FDA was given authority to set standards for every stage of drug testing and could also require market withdrawals.

The 1962 Amendments also set forth the procedural and interpretative regulations regarding new drugs for investigational use; exemptions from section 505(a).[26] The investigational exemption was later known as the Investigational New Drug (IND) Application. Under these regulations, drug sponsors were required to submit a package of materials to FDA for approval prior to starting human trials, and informed consent was required for all subjects prior to trial participation. The IND regulations defined more clearly the phases of drug testing involved in the regulatory approval of a new drug in the 1963 regulations. The IND served the following purposes:

1. Alerts regulators of the intent to begin clinical studies of a drug in the U.S.
2. Provides animal toxicity data indicating reasonable safety of giving the drug to humans
3. Provides information about the manufacturing process
4. Provides chemistry background material.
5. Describes the initial clinical study being proposed, focusing on safety measures and the study population.
6. Provides assurance that an Institutional Review Board (IRB) will approve the study protocol before the study begins[27]

The 1962 Amendments required FDA to re-review all drugs that had been approved on the basis of safety alone under the 1938 FD&C Act, this time looking for evidence of efficacy. This process is generally known as the Drug Efficacy Study Implementation (DESI) review. Examining all pre-1962 NDAs posed a daunting task for FDA. A flood of over 6,000 new drug applications had been submitted in the first 9 years under the FD&C Act, and a total of 13,000 by 1962.[28] Lacking adequate FDA resources for this undertaking in 1966, FDA contracted with the National Research Council of the National Academy of Sciences to perform the DESI review. They were tasked with evaluating the medical effectiveness of 3,000 to 4,000 drugs that had been introduced between 1938 and 1962. Thirty panels of experts reviewed specific drug categories using evidence obtained from FDA, the manufacturers, scientific literature, and the personal expertise of the panel members themselves. They rated each claim for a drug according

---

[25] Public Law 87-781, October 10, 1962,Sec. 107 (c)(2)

[26] Proposed Rule 27 FR 7990, August 10, 1962; Final Rule 28 FR 179, January 8, 1963; 21 CFR Chapter 1, Part 130

[27] Suzanne White Junod, FDA and Clinical Drug Trials: A Short History, updated July 7, 2014
http://www.fda.gov/AboutFDA/WhatWeDo/History/Overviews/ucm304485.htm

[28] FDA History--Part III Drugs and Foods Under the 1938 Act and Its Amendments, updated June 18, 2009
http://www.fda.gov/AboutFDA/WhatWeDo/History/Origin/ucm055118.htm

to six categories: effective; probably effective; possibly effective; ineffective; effective but; and ineffective as a fixed combination (combination drugs for which there was no substantial reason to believe that each ingredient adds to the effectiveness of the combination). [29]

The panels then submitted the reports of their evaluations to the Policy Advisory Committee which in turn transmitted them to the FDA. A final report was issued by the Drug Efficacy Study in 1969.[30] In addition, the panels' reports were published verbatim in the Federal Register after they were received by the FDA. A sponsor had 60 days from the time of a DESI notice regarding its product to submit a supplement making the requested labeling changes.[31]

FDA was challenged to devise a method by which those drugs ruled ineffective could be legally removed from the market. It was faced with the prospect of conducting formal administrative hearings on every drug it proposed to remove from the market. FDA therefore drafted, published, and implemented regulations defining "substantial evidence" leading to a showing of effectiveness under the 1962 Amendments. The "evidence rules" had two components, both of which would have to be met to qualify for an administrative hearing on the proposed withdrawal of their pre-1962 drug:

1. Adequate and well-controlled clinical investigations by experts qualified by scientific training and experience to evaluate the effectiveness of the drug. No hearing would be granted unless there was a "reasonable likelihood" that such evidence would be forthcoming.

2. Submission of positive results from at least two clinical studies in order to escape an automatic withdrawal of approval without a hearing.

The courts upheld this new approach and no hearings were deemed necessary.[32]

The DESI process removed over 1,000 ineffective drugs and drug combinations from the marketplace.[33] These were products that had been deemed approved but were lacking evidence of effectiveness for any indication. Products that were ineffective for only certain indications could remain on the market with timely submission of supplements removing the ineffective claims and making other labeling changes requested by the DESI notice.[34] As part of the process,

---

[29] Suzanne White Junod, FDA and Clinical Drug Trials: A Short History, updated July 7, 2014
http://www.fda.gov/AboutFDA/WhatWeDo/History/Overviews/ucm304485.htm
[30] National Academy of Sciences: Drug Efficacy Study of the National Research Council's Division of Medical Sciences, 1966-1969. http://www.nasonline.org/about-nas/history/archives/collections/des-1966-1969-1.html
[31] 35 FR 135, p 11273, July 14, 1970
[32] Suzanne White Junod, FDA and Clinical Drug Trials: A Short History, updated July 7, 2014
http://www.fda.gov/AboutFDA/WhatWeDo/History/Overviews/ucm304485.htm
[33] Suzanne White Junod, FDA and Clinical Drug Trials: A Short History, updated July 7, 2014
http://www.fda.gov/AboutFDA/WhatWeDo/History/Overviews/ucm304485.htm
[34] 35 FR 135, p 11273, July 14, 1970

FDA drug reviewers themselves published hundreds of critiques of the clinical studies that had been submitted for approved new drugs.[35]

Since 1938, applicants have been responsible for providing all relevant information to FDA, but FDA does not rely solely on information provided by the applicant. The data submitted in an NDA is reviewed and analyzed by FDA staff, including chemists, medical officers, and/or other experts, as needed. Additional information may be requested if needed, and final approval decisions are largely driven by clinical perspective on safety and effectiveness (since 1962) provided by the medical officer, typically a medical doctor familiar with the indication and the use of similar medical products, bringing their medical training, education, and experience to bear on that process. The clinical perspective includes consideration of the severity, seriousness, prevalence, and public health significance of the disease state and availability and relative risks and benefits of alternative treatments in reaching a determination of reasonable safety and effectiveness.

## BACKGROUND ON TERATOGENIC POTENTIAL OF NEW DRUGS

James G. Wilson, "The Evolution of Teratological Testing"
The evaluation of new drugs for their potential to cause birth defects has posed a dilemma for FDA and pharmaceutical manufactures for many years. Prior to 1960 and the thalidomide catastrophe, a modest but expanding activity and body of knowledge in teratology already existed. However, this activity and knowledge were largely confined to academic and research laboratories and made little impact on the agencies in medicine, government, and industry which oversaw public health and safety. Teratologist James Wilson, stated in 1979, "No individual, group, or agency can rightly be blamed for not having sooner brought together the concepts and methodology needed for meaningful animal testing and the regulatory insight and experience needed to intelligently apply test data to human safety evaluation." He concluded that even in 1979 [nearly two decades after the thalidomide disaster], the best animal testing could only provide a limited statement of probability regarding human risk vis-à-vis safety.[36]

Wilson wrote that in the early 1900s, teratology was a descriptive science concerned largely with cataloguing human and animal malformations, often with emphasis on the more bizarre and monstrous aspects. Experimental studies in mammalian teratology had a faltering start in the 1920s, a modest level of control in the 1930s, gained momentum in the 1940s, and grew into a diverse field of scientific inquiry during the 1950s. The use of experimental agents such as radiation, dietary deficiencies, and infections demonstrated an interest in causation, but most of the relevant literature focused on anatomical descriptions of the defects. It took the thalidomide

---

[35] Suzanne White Junod, FDA and Clinical Drug Trials: A Short History, updated July 7, 2014
http://www.fda.gov/AboutFDA/WhatWeDo/History/Overviews/ucm304485.htm
[36] Wilson JG, The Evolution of Teratological Testing, Teratology (1979) 20:205-212.

disaster in the early 1960s to make the world aware that the human embryo was at risk from some environmental variables.[37]

Studies in 1905, 1906, and 1907 reported intrauterine death following x-ray exposure to pregnant cats, guinea pigs, and rabbits, but information on dosage and time of exposure was lacking. In the 1920s, intrauterine death and injuries to the nervous, vascular, digestive and reproductive systems were noted following radiation exposure of pregnant rats, and a variety of frank malformations were produced in rats and guinea pigs, but data on dosage were still lacking. Not until 1935 were adequate experimental details recorded to permit correlations between time and amount of exposure and the types of defects produced, and in 1966 the International Commission of Radiological Protection (ICRP) first published recommendations intended to avoid exposure of human embryos to doses of radiation that might be teratogenic.[38]

Studies with dietary deficiencies in the 1930s produced piglets without eyes and with other serious malformations when the pregnant sows were fed a diet lacking vitamin A. A series of studies of dietary deficiencies in pregnant rodents in the 1940s established beyond doubt that several vitamins were essential to normal development, and these studies gave impetus for expansion of experimental research in teratology, which exploded in the 1950s.

Building on the methodology for testing the adequacy of diets, the safety of pharmaceutical preparations, food additives, and environmental chemicals started to be tested by incorporating them into the food of laboratory rodents. The "three generation reproduction study" involved feeding the test compound continuously to male and female animals through three generations. The emphasis at that time was on general toxicity, and the major objective as regards reproduction was detection of cumulative effects on fertility and on particular sex organs of the parents. Multiple dosage levels were later added along with recording of mating, viability of offspring and success of lactation, but there was still no specific recommendation to look for teratogenic effects. There was no recommendation that either fetuses or newborns even be examined Offspring were counted after birth and fetal survival was the main parameter measured.. Wilson examined NDAs submitted to FDA in 1945 and found no mention whatsoever of testing for effects on any aspect of reproduction.[39]

Even in 1963 after the thalidomide incident and before there had been time for considered action, teratogenicity testing procedures remained crude, with test materials given mainly in the diet throughout pregnancy, and pregnancies were allowed to go to natural delivery, which precluded

---

[37] Wilson JG, The Evolution of Teratological Testing, Teratology (1979) 20:205-212
[38] Wilson JG, The Evolution of Teratological Testing, Teratology (1979) 20:205-212
[39] Wilson JG, The Evolution of Teratological Testing, Teratology (1979) 20:205-212

accurate observations on prenatal and perinatal death and allowed destruction of defective offspring by the mother.[40]

In 1962, the Pharmaceutical Manufacturers Association (PHARMA) founded and provided financial support for the Commission on Drug Safety, which established a Subcommittee on Teratology and quickly recognized an urgent need for better animal tests to determine teratogenic effects. The Commission reported that "...minimal standards for animal experimentation cannot be established at the present time" and that "...such inadequate procedures, if officially recommended, could result in a false sense of security."[41]

In 1965, James G. Wilson and Joseph Warkany published *Teratology: Principles and Techniques*, the first comprehensive reference work in the field of teratology. This book documented the proceedings of a 1964 Workshop in Teratology funded by PHARMA. The FDA participated along with recognized teratologists, the pharmaceutical industry, and university medical sciences.[42]

In 1963-1965, FDA itself conducted a number of small informal conferences with teratologists to discuss the design of animal tests to evaluate the teratogenic potential of new drugs, and in 1966 issued the Guidelines for Reproduction Studies for Safety Evaluation of Drugs for Human Use. These were the first standardized guidelines for doing tests that met both scientific and regulatory constraints. In spite of the progress in developing useful animal studies, Wilson summarized that the final word regarding the risk or safety of a given chemical agent must come from human surveillance after realistic conditions of exposure.[43]

Similarly, in a 1963 publication, RL Brent discussed the teratogenic effects of thalidomide, for which the risk of malformation is estimated to be between 2 and 20%, depending on the duration and time of exposure. He reported that the variable effect of thalidomide on mice, rats, and rabbits was surprising in view of the catastrophic human impact. Malformations occurred in only 5 of 14 studies in rats receiving doses of 20 to 800 mg/kg. In 4 of 8 studies in mice, malformations were reported with doses of 1 to 4,000 mg/kg. Rabbits showed a higher incidence of malformations, which were more severe than other species. Resorptions were produced in monkeys but no malformations had been observed in laboratory primates as of the 1963 report. The rat had been the laboratory animal commonly used to screen drugs for teratogenic effects, and the reason for the difference between the responses in the rat and human fetus had not been determined. Brent and his co-workers conducted a study of Wistar rats in their own laboratory, and no increase in malformations was seen when compared to controls. No typical "thalidomide" malformations occurred. The incidence of resorptions was increased only in animals receiving

[40] Wilson JG, The Evolution of Teratological Testing, Teratology (1979) 20:205-212
[41] Wilson JG, The Evolution of Teratological Testing, Teratology (1979) 20:205-212
[42] Wilson JG, The Evolution of Teratological Testing, Teratology (1979) 20:205-212
[43] Wilson JG, The Evolution of Teratological Testing, Teratology (1979) 20:205-212

intraperitoneal instillation of powdered thalidomide. Brent concluded that a strict clinical surveillance system with prompt reporting of the appearance of congenital malformations in humans, with careful records of the medications given should have enormously reduced the thalidomide disaster in Europe.[44]

Wilson also reported that the influence of sex hormones on the differentiation and development of sexual organs had been of interest since 1917, and 2 decades later when pure hormones became readily available, experimental studies were conducted in rodents using androgens, estrogens and progestins. These studies resulted in intersex features in both male and female rodents after in utero exposure to sex hormones[45]. As further discussed below, these findings were not predictive of the effects of human in utero exposure to DES and related synthetic estrogens.

Dr. Edith L. Potter, A 30-Year Historical Perspective

In 1991, Dr. Edith L. Potter[46] summarized her knowledge of events during the 1940s, 1950s, and 1960s pertaining to the use of DES to treat problems of pregnancy, and discussed the consensus of the scientific community at that time, that DES, when taken by a pregnant woman, carried no risk of harm to herself or the offspring. She spent 33 years specializing in perinatal, infant, and obstetric-gynecologic pathology at the time when preeminent physicians prescribed DES for use in problem pregnancies. She had a unique opportunity to not only observe and study conditions in the fetus but also to fully understand the most current thinking of the time in the fields of obstetrics and gynecology, pediatrics, and perinatal pathology.[47]

In 1936, the Chicago Department of Health initiated a special project, directed by Dr. Potter, in an attempt to reduce infant mortality in Chicago. Regulations were established requiring autopsies on all infants who died in the city, and. Potter examined microscopic sections and took responsibility for the final diagnosis on all those autopsies. By 1952, there had been 10,052 autopsies performed on infants dying in Chicago during the first 28 days of life, during a time when DES was widely used in Chicago for problem pregnancies. Records were provided at the time of autopsy containing information regarding the prenatal care, including medications such as DES.[48]

---

[44] Brent RL, Drug Testing in Animals for Teratogenic Effects: Thalidomide in the Pregnant Rat, Society for Pediatric Research, May 1964

[45] Wilson JG, The Evolution of Teratological Testing, Teratology (1979) 20:205-212

[46] Dr. Edith L. Potter , MD, PhD, DMSc, DHC, DS, Emeritus Professor of Pathology, Department of Obstetrics and Gynecology, Pritzker School of Medicine, University of Chicago and the Chicago Lying-in Hospital

[47] Potter EL, A Historical View: Diethylstilbestrol Use During Pregnancy: A 30-Year Historical Perspective, Pediatric Poisoning, 11:781-789, 1991

[48] Potter EL, A Historical View: Diethylstilbestrol Use During Pregnancy: A 30-Year Historical Perspective, Pediatric Poisoning, 11:781-789, 1991

When Dr. Potter began her career at CLIH in the late 1920s, knowledge of reproductive physiology and endocrinology was limited. Estradiol and progesterone had only recently been available but in limited supply, and scientists were studying the role these hormones played in the body. Infertility, abortion (miscarriage), and prematurity were significant social and medical problems, and it was hoped that knowledge of how these newly discovered hormones affected pregnancy would lead to a better understanding of how to treat these conditions.[49]

Several investigators, including Drs. George Smith and Olive Smith of Boston Dr. Priscilla White of Joslin Clinic (known for her work with diabetic patients), Karnaky in Houston, and Dieckmann (also at CLIH) were preeminent in developing treatments for pregnancy-related problems at that time. They believed that DES was identical in action to natural estrogen, and they used it because if was cheaper and more readily available. DES treatment regimens were developed for spontaneous abortion and for pregnant diabetic women, who previously had only insulin (also introduced only in the 1920s) and still had poor pregnancy outcomes.

The investigators discussed their results fully at meetings with other leaders in the field, and as questions were raised, they adjusted their research to attempt to provide answers. They believed that their treatment saved babies. Very large doses of DES were used in pregnant women, over 1000 mg/day in some patients, and no evidence of toxic effects in either the mother or baby were found.[50]

As noted above, some experimental animal studies suggested that hormones could produce alterations in development of the reproductive tract of both sexes. The changes were both internal and external and could easily be diagnosed at birth. These findings raised the question of whether sex hormones ultimately determine gender, and the availability of androgens and estrogens made it possible to conduct animal experiments to address the questions. The primary purpose of such studies was to attempt to understand the mechanisms of sexual differentiation. According to Potter, papers describing these studies had been misrepresented by some as a warning to the medical community that the use of DES during pregnancy could cause harm to the fetus, when in fact they were thought to be of little clinical significance at the time of their publication. A 1959 summary of experimental work on teratogenesis cited 353 references and did not mention any publication by these investigators (Greene, Burrill, and Ivy). What they did prove was that DES produced the same effects on fetal rats as did natural estrogens. Potter concluded, "Effects produced in one species are not necessarily similar to those produced in another, and the only way to be certain of the effect in the human is to study the human." Her personal postmortem examinations of thousands of fetuses and infants exposed to DES in utero

---

[49] Potter EL, A Historical View: Diethylstilbestrol Use During Pregnancy: A 30-Year Historical Perspective, Pediatric Poisoning, 11:781-789, 1991

[50] Potter EL, A Historical View: Diethylstilbestrol Use During Pregnancy: A 30-Year Historical Perspective, Pediatric Poisoning, 11:781-789, 1991

at CLIH demonstrated that the effects produced in rodents by estrogens were not duplicated in humans.[51]

Potter and Davis in 1948 reported their findings in examinations of DES exposed fetuses delivered by hysterotomy because of life-threatening maternal complications. The study was stimulated by an interest in the development of the reproductive tract and not because of fear that DES was causing harm to the fetus. They found no feminization of male fetuses. Only one female fetus was examined, and the genital organs were normally developed. Potter also examined many other male and female fetuses and neonates that had been exposed to DES in utero. Of all the babies she examined, both living and dead, at no time did she attribute any disease or malformation to DES.  She found no increase in incidence of any pathological conditions in DES-exposed babies. None of the over 10,000 deceased babies (most with medical records) and none of the consultations for the Armed Forces Institute of Pathology revealed any pathological condition attributed to DES. At none of the meetings she attended or consultations in the US or abroad did she ever hear any obstetrician, pediatrician, or pathologist express the opinion that DES was causing harm to either the mother or baby. None of the pathologists at any institution where DES was being used ever reported any harm to a fetus as a result of in utero DES exposure. The consensus of the medical community in the 1940s, 1950s, and 1960s was that DES was safe for both the mother and the baby.[52]

Potter also commented on the 1953 controlled study by Dieckmann et al, also at CLIH. Although the study draws conclusions that DES is ineffective in preventing abortion, she noted that it was not designed to study abortion, and the data do not support the authors' conclusions that it did not prevent abortion. It was dedicated to finding the cause of pre-eclamptic toxemia, a major, potentially fatal complication of late pregnancy and to investigate the effects of DES on toxemia, not abortion, which is an early accident of pregnancy. She noted the same to be true of the Ferguson study. What both studies did demonstrate was the safety of DES. The publications accurately reflected the consensus of the medical community as to the safety of DES.[53]

Potter also noted that records of over 385 children at Harvard considered at high risk for problems were examined and tested. The investigators reported no suggestion of increased frequency of congenital malformations associated with stilbestrol treatment by the routines of Smith and Smith during pregnancy. "This and other foregoing evidences of harmlessness of

---

[51] Potter EL, A Historical View: Diethylstilbestrol Use During Pregnancy: A 30-Year Historical Perspective, Pediatric Poisoning, 11:781-789, 1991

[52] Potter EL, A Historical View: Diethylstilbestrol Use During Pregnancy: A 30-Year Historical Perspective, Pediatric Poisoning, 11:781-789, 1991

[53] Potter EL, A Historical View: Diethylstilbestrol Use During Pregnancy: A 30-Year Historical Perspective, Pediatric Poisoning, 11:781-789, 1991

stilbestrol to the human fetus deserve emphasis because of the well-known effect of estrogens upon rodents."[54]

Potter also emphasized that nothing was found microscopically that forewarned of any harm due to DES from 1938 to 1971. The possibility that a drug might act as a teratogen in humans was not realized until the early 1960s and the thalidomide tragedy, and to speculate that DES or any other agent given during pregnancy would have a latent teratologic effect is inconsistent with the medical knowledge available as of 1967.[55]

Potter's observations and conclusions are very consistent with the FDA's long-standing position that human data should take precedence over animal data in evaluating safety of a drug for use in humans because there is no animal that is sufficiently predictive of human response. It is clear from Potter's summary that the available data on stilbestrol and related compounds (including dienestrol) met regulatory requirements for an NDA at the time. It had been used extensively in pregnant women according to the standard of care at the time, and the investigators conducted studies using methods that were available and generally accepted. Careful investigations, including autopsies with microscopic examinations following deaths of over 10,000 fetuses and neonates in a population with wide antenatal DES exposure had failed to show any evidence of harm related to intrauterine exposure to DES or related compounds. While this data came from clinical and public health sources and not primarily from regulatory studies conducted to support drug approval, the data is the best possible evidence regarding the safety of DES and related compounds.

## BACKGROUND ON SPONTANEOUS ABORTION

Spontaneous abortion, also known as miscarriage, is embryonic or fetal death or passage of products of conception before 20 weeks of gestation.  Threatened abortion is vaginal bleeding without cervical dilation occurring during this time frame, which could be the first evidence of an impending spontaneous abortion of a confirmed viable intrauterine pregnancy. Treatment is usually expectant observation. If spontaneous abortion has occurred or appears unavoidable, further observation or uterine evacuation may be appropriate. About 20 to 30% of confirmed pregnancies have bleeding during the first 20 weeks, and half of them spontaneously abort. Thus, spontaneous abortion occurs in about 10 to 15% of confirmed pregnancies. In all pregnancies, the incidence is probably higher because very early spontaneous abortions are typically mistaken for a late menstrual period. In most cases, the cause is unknown, although certain viruses (e.g., cytomegalovirus, herpesvirus, parvovirus, and rubella virus), immunologic abnormalities, major trauma, and uterine abnormalities (e.g., fibroids, adhesions) or other disorders (e.g., chromosomal or mendelian abnormalities, luteal phase defects) can cause sporadic abortions or recurrent pregnancy loss. Risk factors for spontaneous abortion include age > 35, history of a

---

[54] Potter EL, A Historical View: Diethylstilbestrol Use During Pregnancy: A 30-Year Historical Perspective, Pediatric Poisoning, 11:781-789, 1991
[55] Potter EL, A Historical View: Diethylstilbestrol Use During Pregnancy: A 30-Year Historical Perspective, Pediatric Poisoning, 11:781-789, 1991

previous spontaneous abortion, smoking, certain drugs (e.g., cocaine, alcohol, high doses of caffeine), or a poorly controlled chronic disorder (e.g., diabetes, hypertension, overt thyroid disorders).[56]

Recurrent pregnancy loss, often known as habitual abortion or recurrent abortion, is defined as three or more consecutive spontaneous abortions. In this case, evaluation of both parents may be needed because of the possibility of a treatable cause. Causes may be maternal, fetal, or placental. Maternal causes include uterine or cervical abnormalities (e.g., polyps, fibroids, adhesions, cervical insufficiency), maternal or paternal chromosomal abnormalities (e.g., balanced translocations), luteal phase defects (particularly before 6 weeks), overt and poorly controlled endocrine disorders (e.g., hypothyroidism, hyperthyroidism, diabetes mellitus), or chronic renal disorders. Acquired thrombotic disorders are associated with recurrent losses after 10 weeks. The association with hereditary thrombotic disorders is less clear but does not appear to be strong, except for possibly factor V Leiden mutation.[57]

Placental causes include preexisting chronic disorders such as lupus or chronic hypertension, and fetal causes are usually chromosomal or genetic abnormalities, or anatomic malformations. Chromosomal abnormalities may cause 50% of recurrent pregnancy losses, more commonly during early pregnancy. Aneuploidy may cause up to 80% of all spontaneous abortions before 10 weeks gestation but less than 15% of those occurring after 20 weeks. If no cause is identified, the chance of success with the next pregnancy is 35-85%.[58]

A 1940 survey showed that there were about 240,000 spontaneous abortions in the US each year, and it was estimated that 20-30% of pregnancies ended in spontaneous or induced abortion. It was understood that not all abortions were preventable, in particularly those in which the fetus is imperfect or missing. One study of rejected pregnancies found 46% abnormal fetuses. Another study found 89% normal embryos in abortions occurring at the end of the third month, 50% at the end of the second month, and only 20% were normal at the end of the first month.[59]

In 1947, there were three approaches regarding treatment of spontaneous abortion. The first was the Conservative School, relying on bed rest and sedation to aid in stopping the cramps and bleeding. The postulation was that if a pregnancy is normal enough, then nature will be kind and the pregnancy will continue, but if the pregnancy is sufficiently abnormal or damaged, then no power on earth can save it and to try any other treatment is useless.[60]

---

[56] Dulay AT, Spontaneous Abortion (Miscarriage), Merck Manuals Professional Edition/ Gynecology and Obstetrics/ Abnormalities of Pregnancy; http://www.merckmanuals.com/professional/gynecology-and-obstetrics/abnormalities-of-pregnancy/spontaneous-abortion (updated January 2014)
[57] Dulay AT, Spontaneous Abortion (Miscarriage), Merck Manuals Professional Edition/ Gynecology and Obstetrics/ Abnormalities of Pregnancy; http://www.merckmanuals.com/professional/gynecology-and-obstetrics/abnormalities-of-pregnancy/spontaneous-abortion (updated January 2014)
[58] Dulay AT, Spontaneous Abortion (Miscarriage), Merck Manuals Professional Edition/ Gynecology and Obstetrics/ Abnormalities of Pregnancy; http://www.merckmanuals.com/professional/gynecology-and-obstetrics/abnormalities-of-pregnancy/spontaneous-abortion (updated January 2014)
[59] Rosenblum and Melinkoff, Preservation of the Threatened Pregnancy with Particular Reference to the Use of Diethylstilbestrol, WJ of S, O&G, November 1947.
[60] Rosenblum and Melinkoff, Preservation of the Threatened Pregnancy with Particular Reference to the Use of Diethylstilbestrol, WJ of S, O&G, November 1947.

The second approach was the Vitamin School, based on animal evidence that Vitamin E deficiency could retard the development of fetal-placental blood vessels. Although this had not been observed in pregnant women, Vitamin E therapy became popular and some had reported successful results in as high as 89% of treated patients. Likewise Vitamin C and Vitamin K were declared to be of value in maintaining pregnancy.[61]

The Endocrine School treated threatened abortion with thyroid supplementation (based on the knowledge that thyroid deficiency may cause infertility or abortion), or steroid progestogens, with or without estrogens, or steroid estrogens alone. Success rates reported with progestogens varied from 18.2% to above 90%. It had been suspected that a lack of progesterone in early pregnancy is probably accompanied by a corresponding lack of estrogenic hormone, and some obstetricians began to administer both hormones in the treatment of threatened abortion. A published study in 1945 reported success in 16 of 24 (67%) treated pregnancies. The use of large doses of estrogens began in 1942, with as much as 200 mg of DES daily in the treatment of threatened abortion and 10 mg twice daily for habitual abortion.[62]

In Rosenblum and Melinkoff's 1947 paper, they described a group of 97 patients with threatened or habitual abortion and threatened premature labor treated with DES with more favorable results than they had been able to achieve with any other type of treatment. They had observed no harm during pregnancy, and the treatment was deemed rational. However, they raised the following questions that had not been completely answered:

1. Will DES in large doses cause pituitary of other glandular imbalance which will become manifest later in life?
2. Is DES in such large doses carcinogenic and as such unsafe to give to pregnant women?
3. Can DES in any way affect the glandular balance of the child in utero, particularly the male child?
4. Is DES the drug which will give better results in general use for the treatment of threatened or habitual abortion than drugs previously used?[63]

Although there was not enough data to fully answer these questions, large doses of DES had been administered to a large number of pregnant women (probably many thousands) over the previous 6 to 8 years and none of these ill-effects had been reported.[64]

## DEVELOPMENT OF DIENESTROL

Dienestrol is a non-steroidal synthetic estrogenic substance, similar in structure and pharmacologic properties to diethylstilbestrol (stilbestrol, DES). It was commercially available in England and in Canada prior to the NDA submission in the U.S. The chemical properties had

---

[61] Rosenblum and Melinkoff, Preservation of the Threatened Pregnancy with Particular Reference to the Use of Diethylstilbestrol, WJ of S, O&G, November 1947.
[62] Rosenblum and Melinkoff, Preservation of the Threatened Pregnancy with Particular Reference to the Use of Diethylstilbestrol, WJ of S, O&G, November 1947.
[63] Rosenblum and Melinkoff, Preservation of the Threatened Pregnancy with Particular Reference to the Use of Diethylstilbestrol, WJ of S, O&G, November 1947.
[64] Rosenblum and Melinkoff, Preservation of the Threatened Pregnancy with Particular Reference to the Use of Diethylstilbestrol, WJ of S, O&G, November 1947.

been described in the literature, and the name had been recommended by the British Pharmacopeia Commission and approved by the British General Medical Council. According to the NDA, England's Joint Scientific Committee on the Use of Estrogens in Cancer had specified that dienestrol is relatively non-toxic and had recommended it to be employed by investigators for such use. It was reported to have a high degree of biologic activity and to be exceptionally well-tolerated in therapeutically effective doses.[65]

## FDA REVIEW OF DIENESTROL

NDA #5991 for dienestrol Tablets was submitted to FDA on June 24, 1946.[66]

The NDA provided the following literature references in support of its application:[67]

1. In 1938 CW Emmens (J. Physiol. 94:22P) reported that the relative oral activity of dienestrol in mice compared to subcutaneous dosage was higher than that of any previously examined estrogen.[68]
2. In 1942 Josephine Barnes (BMJ 1:601) reported the use of dienestrol to inhibit lactation in 37 women, concluding that it was effective in about one-tenth the dosage required with stilbestrol or hexestrol. She also reported on the use of dienestrol for menopausal symptoms. The best dose was reported to be 3 mg spread over 5 days.[69]
3. In 1944 Josephine Barnes (BMJ 2:79) subsequently reported use of dienestrol in a small series of menopausal patients, indicating that the compound is a safe and non-toxic estrogen.[70]

In addition, reports of the following studies (193 cases) were submitted in the NDA:

1. Abraham Cantarow and associates at Jefferson Medical College, Philadelphia, studied White's dienestrol in a total of 86 patients:[71]

18 women (11 with menopause; 4 surgical menopause; 1 primary ovarian deficiency; 1 adrenogenital syndrome; 1 premenstrual tension) were studied to evaluate blood count and liver function. No changes in hematologic parameters or liver function occurred with daily doses of 0.1 to 1.0 mg for approximately 3 to 7 months. Estrogen effects were monitored by clinical symptoms and vaginal smears. Marked relief of menopausal symptoms occasionally occurred with 0.1 mg, usually with 0.2 mg, and completely with 0.5 mg (except in 2 cases with only moderate improvement). Mastalgia and premenstrual tension improved with 0.1

---

[65] MRKDEN:001326
[66] MRKDEN:001324-001325
[67] MRKDEN:001326-001327
[68] MRKDEN:001330-001332
[69] MRKDEN:001333-001337
[70] MRKDEN:001338-001339
[71] MRKDEN:001340-001378

mg daily. The vaginal smear responses lagged slightly behind the symptomatic response and showed minimal estrogen effect with 0.1 mg, slight to moderate with 0.2 mg, and moderate to good with 0.5 mg. Individual summaries were submitted in the NDA for each of these 18 patients, including age, race, marital status, diagnosis, clinical status, examination findings, endocrine studies, prior treatment, current treatment dose and duration, clinical response, adverse events, vaginal smear response, and laboratory studies.[72]

42 women with menopausal symptoms were evaluated with vaginal smears and clinical effect after receiving 0.1 to 1.0 mg daily for 3 to 8 months. No toxic reactions or any untoward symptoms were reported that could be attributed to dienestrol. There was no headache, nausea or vomiting. In patients previously treated with other estrogens, the comparative potency was estimated to be one to three times that of stilbestrol.[73]

26 women treated for suppression of lactation reported prompt and effective results with doses of 1.5 mg daily for 3 days, followed by 0.5 mg daily for another 7 days, and no adverse clinical effects. Results were comparable to those seen with stilbestrol 1.0 mg three times daily for 3 days followed by 1.0 mg for another 7 days.[74]

2.  Rita S. Finkler administered White's dienestrol 0.1 and 0.5 mg tablets to 78 patients over a period of 5 months. Seventy menopausal patients were treated for menopause symptoms, including hot flushes, chills, insomnia, headaches, nervousness, paresthesia, arthralgia, and mental depression. A dose of 0.3 mg daily relieved most of the mild cases within 2 to 3 weeks.   Higher doses of 0.5 to 1.5 mg daily were required to relieve the more severe symptoms. Patients with other medical complications (hypertension, gall bladder disease, gastrointestinal disturbances, involutional melancholia, and arthralgia) failed to respond. Vaginal smears were evaluated, and results generally correlated with clinical improvement. Patients with neuroses generally showed improvement in the vaginal smear but with no clinical      improvement.      Mild      nausea      occurred      in      three      patients.[75]

Eight non-menopausal patients were also treated for a variety of disorders, including pelvic hypoplasia with secondary amenorrhea and sterility, functional uterine bleeding, secondary amenorrhea and sterility due to adrenal hyperplasia, functional bleeding and hypertrichosis, primary amenorrhea, and dysmenorrhea. Duration of therapy was 1 to 5 months. Favorable results were reported in 5 cases, and no results in 3 cases (1 functional uterine bleeding, 1 dysmenorrhea, and 1 functional bleeding with hypertrichosis).   There were three cases of slight nausea and no other evidence of toxic effects. The author reported dienestrol to be a very valuable addition to estrogenic medication. "Its prompt relief of menopausal symptoms

[72] MRKDEN:001340-001378
[73] MRKDEN:001340-001378
[74] MRKDEN:001340-001378
[75] MRKDEN:001379--001380

and absence of toxic side-effects make this preparation particularly commendable." [76]

3. Sevringhaus and Sikkema[77] studied White's dienestrol in a small series of 21 menopausal patients at the University of Wisconsin Medical School. All but two of the subjects had prior experience with other natural or synthetic estrogens. Only 13 subjects returned for enough follow-up visits to justify any conclusions. Of these, 5 women reported excellent or completely satisfying results with doses of 0.1 to 0.6 mg daily. Another 7 subjects reported good but not complete relief of symptoms. Only one woman had unsatisfactory results, and she chose to discontinue the trial at a dose of only 0.3 mg daily. Of the 21 patients overall, none reported nausea, emesis, or other side effects at dosages up to 0.5 mg twice daily. Three patients had previously had nausea and emesis with DES treatment. However, some of the subjects had spontaneous reports of better well-being following prior use of natural estrogens. The investigators stated, "We think Dienestrol is the most satisfactory synthetic estrogen with which we have had experience." They found doses of 0.2 to 0.5 mg daily to be "adequate, dependable, and tolerated without unpleasant side effects."[78]

4. Edgar Gordon provided a preliminary report of his experience with White's dienestrol in about 16 cases under treatment and reported that "the results have been uniformly good—there have been literally no toxic reactions of any sort and…the 0.1 mg. dose daily has been adequate for practically every case."[79]

As required, the sponsor also provided a full list of the articles used as components of the drug and a full statement of the composition of the drug. The manufacturing procedure, tests of purity, and assays were described, and a bibliography was provided. Labeling was also provided.[80]

FDA responded to White Laboratories on August 8, 1946, acknowledging receipt of the application and a subsequent call between the FDA and White Laboratories regarding additional ongoing investigations by other investigators comparing the safety and efficacy of dienestrol with similar preparations already on the market. FDA declined to make any written comment on the application until the additional data were submitted. The effective date for the application was postponed for 120 days to allow for submission of the additional data.[81]

---

[76] MRKDEN:001379--001380
[77] MRKDEN:001381-001384
[78] MRKDEN:001379--001380
[79] MRKDEN:001385-001386
[80] MRKDEN:001387-001400
[81] MRKDEN:001313

On August 28, 1946, the additional data on 104 cases treated with dienestrol was submitted to NDA 5591,[82] including reports from the following investigators:

1.  AE Rakoff, Jefferson Hospital, Philadelphia: additional 30 patients treated with 0.1 to 2.0 mg daily for up to 8 weeks, 12 for inhibition of lactation, 12 for menopausal syndrome, 2 for primary amenorrhea, and 4 for secondary amenorrhea. Satisfactory therapeutic response was noted in all cases, and no headache, nausea or vomiting, or other toxic manifestation.[83]

2.  Ruth St John of Ohio State University Medical School: 34 patients treated with 0.1 to 1.0 mg daily for periods of a few days up to 12 consecutive months, 22 for menopausal syndrome, and 12 for correction of menstrual irregularities. An adequate therapeutic effect was observed by symptomatic improvement, vaginal smear response, and correction of menstrual irregularities. In the experience of this investigator, the doses of dienestrol required to produce therapeutic effects were approximately the same as for DES, and intolerance to dienestrol, as manifested by nausea, vertigo, flatulence and headache, was regarded as having approximately the same incidence as intolerance to DES used in comparable doses. No permanent toxic side-effects were noted.[84]

3.  Rita S. Finkler of Newark Beth Israel Hospital: 11 additional patients treated with daily dosage of 0.5 to 1.5 mg of dienestrol. Prompt relief of symptoms of estrogenic deficiency was observed without vertigo, nausea, irritability, undue uterine bleeding or any other evidence of intolerance to the drug.[85]

4.  Willard M. Allen of Washington University School of Medicine: studied a method of assay that depends on stimulation of withdrawal uterine bleeding. Daily doses of 0.5 mg of dienestrol for 21 days did not usually bring about withdrawal bleeding, although DES at the same dose and duration usually does produce this effect. In 4 patients, no toxic reactions were noted.[86]

5.  Zeph JR Hollenbeck of Ohio State University Medical School: 18 menopausal patients were treated with doses of 0.3 to 1.5 mg of dienestrol daily for 1 to 6 months for menopausal syndrome, and no signs of intolerance or toxic manifestations were noted.[87]

---

[82] MRKDEN:001299-001301
[83] MRKDEN:001302-001303
[84] MRKDEN:001304-001305
[85] MRKDEN:001306
[86] MRKDEN:001307-001308
[87] MRKDEN:001309

6. Edgar S. Gordon of the University of Wisconsin: 7 additional cases (23 altogether) treated for climacteric manifestations with daily doses of 0.1 to 0.5 mg of dienestrol. There were no unpleasant reactions, menopausal symptoms were very effectually controlled, and vaginal smears showed good 3+ to 4+ estrogenic activity. He concluded, "Generally speaking I consider Dienestrol to be as good or better than any other therapeutic agent that I have tried for control of the menopause. Most of the patients are eagerly awaiting its availability on the market."[88]

On September 11, 1946, FDA notified the sponsor that the original application submitted on June 25, 1946 was considered as having been withdrawn and the amended application was considered as having been filed August 29, 1946. FDA inquired about whether or not any pharmacological studies had been conducted, and requested that they be included in the application. FDA also stated that claims for other than menopausal syndrome and suppression of lactation should be deleted, and recommended deleting the word "exceptional" to more accurately describe the drug.[89] On October 15, 1946, FDA notified the sponsor that a 120 day postponement was deemed necessary to enable proper study and investigation.[90]

An amendment was submitted on November 12, 1946 with a report of the Comparative Toxicological Study of Dienestrol and Diethylstilbestrol, by R.S. Teague, Medical College of Alabama.[91] This study was conducted on hooded male and female rats from the Long-Evans strain, divided into six groups. Each group received either dienestrol, diethylstilbestrol or the solvent, propylene glycol plus 10% alcohol, administered orally. Half of each group were treated for 21 days and the other half for 99 days on a lower dose level. At the conclusion of the experiment, the rats were anesthetized and their organs removed and weighed. Special attention was paid to the influence of the compounds on body and organ weights, hematopoiesis and gross pathology of the organs. It was noted that the dose levels were very high, approaching the toxic dosage limits for these estrogens. Previous researchers had reported the minimum estrous-producing oral dose for DES and dienestrol as 0.3 mcg. Thus the average daily doses administered in these experiments ranged from 5,000 to 25,000 times the estrogenic dose for rats. Body weight was significantly decreased with both estrogens in all cases, more so with dienestrol. The following effects on various organs were reported:[92]

> Liver: Significantly increased weight with estrogens, similar in both groups.
> Kidneys: Increased weight in only one series and not extreme.
> Spleen: Variable results
> Adrenal glands: Enlargement in both estrogen groups, but inconsistent effects

---

[88] MRKDEN:001310
[89] MRKDEN:001298
[90] MRKDEN:001295
[91] MRKDEN:001265-001278
[92] MRKDEN:001265-001266

Pituitary: Enlargement in all estrogen-treated rats, more pronounced in the 99-day test, stronger effect with dienestrol

Uterus: Enlargement in all estrogen-treated rats, more pronounced with dienestrol.

Ovaries: Atrophied in the 99 day test, more pronounced with DES.

Testes: Both estrogens produced atrophy, especially on long-term experiments.

Seminal Vesicles: Decreased weight, especially with DES after 99 days.

Ventral Prostate: Decreased weight, more pronounced after dienestrol treatment.

Liver glycogen: Increased levels with both estrogens, not always significant.

Blood sugar: no marked change

Hemoglobin: lower in estrogen-treated rats than in controls, but if body weight is considered, the difference disappears.[93]

In the 21-day groups, one of the six animals treated with DES died, and in the 99-day groups on a lower dose, three of six rats on dienestrol died.

No definite conclusion regarding the relative toxicity of dienestrol and DES could be drawn because in each series of tests, the dose levels of dienestrol were 33% higher than with DES, while the estrogenic activity of dienestrol had been previously reported to be approximately twice that of DES. It was noted that the organ weight changes could be attributed to the great gynecogenic activity of these estrogens, since similar weight changes occur after large doses of natural estrogens. The increase in liver weight has also been shown to occur in rats following large doses of natural and synthetic estrogens. The sponsor concluded that the only conclusion that could be drawn from Teague's study is that the toxicity of dienestrol, under the conditions of these experiments, seems no greater than that of diethylstilbestrol.[94]

On November 21, 1946, FDA sent White Laboratories a letter stating that no order will issue under section 505(d) of the Act to refuse to permit the application to become effective.[95] This was the equivalent of an approval letter at that time.

Of note, the studies submitted were conducted using White's dienestrol. The company did not rely upon the findings of DES or any other previously approved estrogenic product to justify marketing of its product. However, comparisons were made between dienestrol and DES concluding that dienestrol is no more toxic than DES and seems to work at least as well for its intended use. The studies appear to be consistent with the standard for marketing approval at the time of their submission in 1946 as discussed earlier. The comparisons with DES, a previously marketed drug with an effective application, were appropriate at that time, and comparisons of a

[93] MRKDEN:001266-001267
[94] MRKDEN:001267-001278
[95] MRKDEN:001263-001264

new drug to other drugs of the same class are commonly made even today in evaluating the safety profile to ensure that the drug has no greater risk than similar approved drugs.

On December 30, 1947, White Laboratories submitted a supplement to NDA #5991 proposing to market an intramuscular injection of dienestrol in multi-dose vials of a 5 mg/cc aqueous suspension. Sixteen women with climacteric symptoms or primary ovarian deficiency proven by hormonal assay had been treated at Jefferson Medical College in doses of 1.0 to 10 mg once or twice weekly. The average dose required for a satisfactory therapeutic response, determined by vaginal smears and clinical improvement, was 2.5 to 5 mg once or twice weekly. The injections were well-tolerated with no signs of local irritation or systemic reactions such as nausea, vomiting or headache.[96] On January 26, 1948, FDA sent a letter stating that no order will issue under section 505(d) of the Act to refuse to permit the amended application to become effective.[97]

Another supplement was submitted on January 11, 1950, proposing a higher-potency oral tablet (10 mg) "for use in certain conditions in which intensive treatment with estrogenic substances has been found to be valuable."[98] The submission stated, "Numerous reports have been published in recent years, proving the value of intensive estrogen therapy in the palliative management of inoperable cancer of the prostate and the female breast, and in such conditions as functional uterine bleeding, threatened and habitual abortion, and late complications of pregnancy in diabetic women. The estrogen used in most instances has been diethylstilbestrol but the results obtained would be valid for any of the estrogens because of their similarity of action on various end organs. Difference in the action of these compounds is only one of degree."[99]

The supplement includes reference to Dr. R.S. Teague having studied dienestrol and DES in rats and dogs, concluding that they have about the same activity on chronic oral administration and no important differences in their toxic effects.[100] In addition, it included a published study by Bishop et. al. on the potency and Clinical "toxicity" of synthetic estrogens including dienestrol in the treatment of 168 patients, 146 with secondary amenorrhea and 22 with primary amenorrhea. The study groups were too small for statistical comparison, but the effect of each other estrogen was compared with that of DES in 75 cases. Dienestrol was about a quarter as potent as DES. He concluded that nausea is more likely with stilbestrol in therapeutic doses than with dienestrol or the other estrogens studied.[101,102]

---

[96] MRKDEN:001215-001253
[97] MRKDEN:001213
[98] MRKDEN:001156
[99] MRKDEN:001161
[100] MRKDEN:001165
[101] MRKDEN:001161
[102] MRKDEN:001166-001168

Literature references were submitted to support use of dienestrol in symptomatic treatment of cancer: [103]

1.  Walpole and Paterson (Lancet 2:783, 1949) studied 25 women with mammary carcinoma, giving dienestrol to 10 patients in daily doses of 1.2 mg and to another 15 patients in daily doses of 20 mg. It was continued for 18 months in one patient with no untoward effects. They concluded that clinical improvement was greatest in the older patients and in those receiving the higher doses of estrogen.[104]

2.  Dienestrol was one of the estrogenic substances selected by the Therapeutic Trials Committee for evaluation in mammary cancer. On June 21, 1949, the Committee reported that the Council on Pharmacy and Chemistry had accepted for publication the claim that dienestrol in daily doses of 15 mg may be palliative in cases of advanced metastatic carcinoma of the breast in women who are at least five years postmenopausal.[105]

3.  Dr. Lewis Hurxthal of Lahey Clinic, Boston, administered large doses of dienestrol in a variety of diseases and reported using up to 100 mg daily in treatment of breast cancer which was "tolerated better than expected."[106]

4.  Ferguson (Lancet 2: 551, 1946) treated 23 cases of prostate cancer with estrogens, including at least five receiving dienestrol in doses of 2 to 15 mg daily. Survival was significantly prolonged in comparison to a control group. He stated that the side effects of estrogen therapy, particularly in large doses and over long periods, were relatively harmless. He had used dienestrol doses of 40-50 mg daily in several instances without adverse results other than occasional vomiting.[107]

The following literature references were submitted to support use of dienestrol in treatment of functional uterine bleeding:

1.  Bishop (BMJ 1:165, 1949) said that probably the most dramatic result of the use of sex hormones in gynecology is the hemostatic effect produced by large doses of estrogen in cases where bleeding has been prolonged or alarmingly heavy. He used doses of dienestrol from 15 to 50 mg.[108]

2.  Karnaky used dienestrol in divided daily doses of 20 to 100 mg (dosed as 5 to 25 mg four times/day) for functional uterine bleeding. He reported that bleeding is effectively controlled and that nausea is not encountered.[109]

3.  Emmert treated approximately 200 cases of functional uterine bleeding and threatened abortion, using dienestrol in doses of 5 mg every hour for eight doses, or a total of 40 mg

---

[103] MRKDEN:001162
[104] MRKDEN:001169-001172
[105] MRKDEN:001162
[106] MRKDEN:001173-001175
[107] MRKDEN:001176--001179
[108] MRKDEN:001166--001168
[109] MRKDEN:001181

in 8 hours, followed by a daily dose of 1 or 2 mg. He found it safe and recommended its inclusion with other dienestrol products.[110]

The following studies were submitted in treatment of habitual and threatened abortion:

1. Dr. Abraham E. Rakoff, of Jefferson Medical College, treated 22 cases of habitual and threatened abortion with large doses of dienestrol, usually complemented by progesterone therapy. The dosing schedule started with 5-10 mg in the first 2 months of pregnancy, increasing at 1-2 month intervals to 30-50 mg during months 5 -8. Eight of 12 patients delivered babies at term despite at least 2 previous abortions. Serum estrogen levels prior to therapy were lower than normal in almost every case, and generally increased from 50 to 100% within two weeks and maintained within a range regarded as normal for pregnancy, reportedly similar to increases in serum estrogen obtained with comparable doses of DES.[111]

2. Dr. Joseph H. Goldcamp, of Cincinnati, Ohio, studied large doses of dienestrol in 50 cases of threatened abortion and four cases of menorrhagia. His dosages ranged from 20 mg daily to 60 mg hourly, continued for three days. He reported the dose to be "extremely well tolerated with no symptoms of nausea, vomiting, dizziness or headaches." At the time of submission of the supplement, five patients had delivered normal babies at term. Five others were past the eighth month of pregnancy and had discontinued dienestrol. Two had aborted, one with an abnormal fetus that was thought to be probably dead before therapy was started. Thirty eight patients remained under treatment, including five with two or more previous spontaneous abortions and farther along in their pregnancy than they were at the time of the previous abortions.[112]

On January 27, 1950, FDA sent White Laboratories a letter stating that no order will issue under section 505(d) of the Act to refuse to permit the amended application to become effective.[113]

In 1955, the name of White's dienestrol tablets was changed to Synestrol Tablets.[114]

Following implementation of the 1962 amendments, the DESI efficacy review of previously approved drugs began, and the abovementioned contract with the National Academy of Sciences/ National Research Council to review individual drugs and individual indications began in 1966. This review coincided with emerging reports of clear cell adenocarcinoma of the vagina in young women exposed in utero to DES and similar drugs, reported by Herbst et al in an April 1971

---

[110] MRKDEN:001180
[111] MRKDEN:001182-001183
[112] MRKDEN:001163-001164; MRKDEN:001184-001185
[113] MRKDEN:001147
[114] MRKDEN:001098

publication in the New England Journal of Medicine.[115] Reports of vaginal or cervical adenosis, transverse cervical or vaginal ridges or septa were reported later,[116] and several years after that, uterine abnormalities were reported[117]. Cases of reproductive dysfunction were reported even later[118] in association with DES.

The DESI notice for White's dienestrol was sent to the company by FDA on August 3, 1971 with a statement that an announcement will soon be published in the Federal Register.[119] The FR notice, which applied to dienestrol, diethylstilbestrol, and all closely related congeners, was posted on November 10, 1971.[120]   The notice stated that these drugs had been classified as possibly effective for the indication of "Prevention of accidents in pregnancy," such as threatened and  habitual abortion, but that due to the recent finding of a statistically significant association between  the use of diethylstilbestrol in early pregnancy and the later occurrence of certain cancers, use of DES as well as "all closely related congeners" is contraindicated in pregnancy.[121]   An opportunity to request a hearing to show why such indications should not be deleted from the labeling was provided. Such a request was to be submitted within 30 days of the notice according to section C(2), if the sponsor wanted to provide justification for continuing to market the product without the requested changes.[122]   All such requests were required to be supported by "previously unsubmitted" data and to "include data from adequate and well-controlled clinical investigations."[123]

Schering, who had acquired White Laboratories in September 1957 and later merged with Merck in 2009, submitted a supplement to NDA #5991 on January 10, 1972 with the recommended labeling changes, removing all indications for use in pregnancy and contraindicating use in pregnancy.[124] FDA sent a repeat request for the same labeling change on March 22, 1973.[125] Schering responded on April 3, 1973 referring to its January 10, 1972 supplement and attaching

---

[115] Herbst AL et al, Adenocarcinoma of the Vagina—Association of Maternal Stilbestrol Therapy with Tumor Appearance in Young Women, NEJM 1971; 284:878-881.

[116] Herbst AL et al, Vaginal and Cervical Abnormalities After Exposure to Stilbestrol In Utero, Obstetrics & Gynecology, Vol. 40, No.3, September 1972

[117] Kaufman et al, Upper Genital Tract Changes Associated With Exposure In Utero To Diethylstilbestrol Am. J Obstet. Gynecol. 128: 51, 1977.

[118] Stillman RJ, In Utero Exposure to Diethylstilbestrol: Adverse Effects on the Reproductive Tract and Reproductive Performance in Male and Female Offspring, Am. J. Obstet. Gynecol  Vol 142 No.7, April 1, 1982

[119] MRKDEN:000612

[120] Federal Register, Vol. 36, No 217 Wednesday, November 10, 1971, p 21537

[121] Federal Register, Vol. 36, No 217 Wednesday, November 10, 1971, p 21537

[122] Federal Register, Vol. 35, No 135 Tuesday, July 14, 1970, p 11273

[123] Federal Register, Vol. 36, No 217 Wednesday, November 10, 1971, p 21538

[124] MRKDEN:000448-000506

[125] MRKDEN:000433

copies of the final printed Prescribing Information.[126] It was acknowledged by FDA on August 3, 1973.[127]

Schering removed Synestrol Tablets from the market in October 1974.[128]

CONCLUSIONS

1. Based on the available information, it is my opinion to a reasonable degree of medical and scientific certainty that White Laboratories (and its successors) acted according to the rules and regulations, and the standard of care in existence at the time White Laboratories' dienestrol was developed, approved[129] by the FDA , and marketed.

2. Based on the available information, it is my opinion to a reasonable degree of medical and scientific certainty that the labeling of dienestrol was in compliance with the standard at the time and was approved by the FDA.

3. Based on the available information, it is my opinion to a reasonable degree of medical and scientific certainty that Schering, in its capacity as White Laboratories' successor, acted consistent with the existing standard of care in its response to the DESI review in removing all indications for use of dienestrol in pregnancy and contraindicating its use in pregnancy.

I reserve the right to revise my opinions if additional data bearing on these issues becomes available.

*Dena R. Hixon*

Dena R. Hixon M.D.
November 23, 2015

---

[126] MRKDEN:000415-000417
[127] MRKDEN:000414
[128] MRKDEN:001452-0001463
[129] According to Public Law 87-781, October 10, 1962,Sec. 107 (c)(2,) An application that was "effective" on the day immediately preceding the enactment date of the 1962 amendments was deemed to be an application "approved" within the meaning of the Act as amended.