# EXHIBIT C

**EXPERT REPORT OF**

**Laura M. Plunkett, Ph.D., DABT**

## I.      Training and Qualifications

1.      I am a pharmacologist, toxicologist, United States Food and Drug Administration (FDA) regulatory specialist and principal of a consulting company known as Integrative Biostrategies, LLC. Integrative Biostrategies, based in Houston, Texas, is a consulting firm that works at the interface of biological science, regulatory affairs and business decisions to provide its clients with science-based solutions to issues associated with product development and stewardship. Before joining Integrative Biostrategies in 2001, I was head of the consulting firm known as Plunkett & Associates.

2.      I am board-certified as a Diplomate of the American Board of Toxicology. I am a member of several professional organizations and have authored or co-authored numerous scientific publications. I have over twenty years of experience in the areas of pharmacology and toxicology and have worked in both government and academic research. I have taught pharmacology and toxicology at the undergraduate and postgraduate levels.

3.      I received a B.S. degree in 1980 from the University of Georgia and a Ph.D. in pharmacology from the University of Georgia, College of Pharmacy in 1984. My doctoral research was focused in the area of cardiovascular pharmacology and specifically dealt with delineating neurochemical mechanisms responsible for the cardiac toxicity of digitalis glycosides.

4.      From June 1984 through August 1986, I was a Pharmacology Research Associate Training (PRAT) fellow at the National Institute of General Medical Sciences, Bethesda, Maryland. I worked in a neurosciences laboratory of the National Institute of Mental Health. My research focused on the role of various brain neurochemical systems involved in the control of autonomic nervous system and cardiovascular function.

1

5.      From September 1986 to June 1989, I was an Assistant Professor of Pharmacology and Toxicology in the medical school at the University of Arkansas for Medical Sciences, Little Rock, Arkansas, where I performed basic research in the areas of neuropharmacology and toxicology as well as cardiovascular pharmacology and toxicology. I taught courses for both medical students and graduate students in pharmacology and toxicology as well as the neurosciences. During this time, I studied drugs of all classes that affect brain function, including drugs used to treat diseases such as depression (*i.e.,* anti-depressants). As a pharmacologist, my work was directed towards understanding the biologic mechanisms of drug actions.

6.      From December 1989 to August 1997, I worked for ENVIRON Corporation, first in the Arlington, Virginia office and then in the Houston, Texas office. I worked specifically within the health sciences group and most of my projects dealt with issues surrounding products or processes regulated by the U.S. Food and Drug Administration (FDA). During my consulting career (ENVIRON, Plunkett & Associates, and Integrative Biostrategies), I have worked on a variety of projects dealing with the regulation of products by the FDA, including human drugs, veterinary drugs, biologics, medical devices, consumer products, dietary supplements and foods. I have advised my clients on regulatory issues and strategies for their products (relating to both Canadian and American regulations), designed preclinical and clinical studies for both efficacy and safety, advised clients on issues related to statements regarding efficacy and warnings for their products based on the current labeling regulations and generally acted as a regulatory affairs staff for small companies in their early stages of product development. A tool common to all my work as a consultant would be risk assessment, including many projects where risks and benefits of human therapeutics were at issue.

7.      With respect to my experience that is directly relevant to the issues in this case, I have done a great deal of work on projects related to regulation of human drug products. I have done a great deal of work in recent years examining the risks to developing organisms that are associated with exposure to chemicals of all types, including assessing the underlying basis for the susceptibility of developing organisms to chemical exposure. I have lectured graduate students and medical students on the biochemical basis for the effects produced by drugs that

affect hormonal function. I have lectured to graduate students, law students and pharmacy students on FDA regulations as they apply to human drug products, including lectures that have covered the human drug approval process, labeling of human drugs, and post-market reporting requirements for drug manufacturers. I have knowledge and expertise related to changes in the FDA regulations over the years from the initial passage of the Federal Food Drug and Cosmetic Act (FFDCA) in 1938 up to the most current amendments to the FFDCA in 2007. This experience has included understanding the differences in regulatory standards over the decades and the standards used over time to assess the safety and efficacy of human drugs. This knowledge resulted from courses I have taken that were offered through the Food Drug and Law Institute (FDLI), as well as experience while working at ENVIRON under the direction of former FDA employees.

8.      Throughout my career I have published dozens of articles which are listed in my curriculum vitae (attached as Appendix A). In litigation, I have provided expert testimony and been qualified in both state and federal courts in the areas of pharmacology, pharmacokinetics, toxicology, risk assessment and FDA regulations. Also attached to this report as Appendix B is a list of all documents I have reviewed in this case.

## II.     Information Reviewed

9.      During the course of my work on this case, I have reviewed the following materials:

a) scientific literature relating to the pharmacology, pharmacokinetics and toxicology of dienestrol and other synthetic estrogens that have been used clinically;

b)  scientific literature relating to the pharmacokinetics of drugs during pregnancy and the exposure of the fetus *in utero*;

c)  labeling for dienestrol and other pharmaceutical drugs marketed at the time that dienestrol was marketed;

d)  regulations of the FDA relating to the development, approval, labeling and marketing of prescription drug products;

e) expert reports and depositions of other individuals involved in cases where synthetic estrogens were the drugs of concern; and

3

f) other confidential documents produced during the litigation.

It should be noted that all of the sources listed above are ones commonly used in my work as a pharmacologist, toxicologist, and risk assessor. At the end of this report is attached a list of the published articles cited throughout this report. All opinions expressed in this report are expressed based on my training and experience and to a reasonable degree of scientific certainty.

## III.    Background

10.    Dienestrol is a synthetic estrogen compound that was marketed by White Laboratories starting in the 1940's. It is known by other names that include Synestrol, Dienoestrol, and its chemical name 4,4'-(Diethylideneethylene)diphenol. The pharmacological activity of dienestrol was first described in 1938 (Dodds *et al.* 1938. *Lancet* 1:1389; Dodds *et al.* 1938. *Nature* 141:247; Campbell *et al.* 1939. *Lancet* 2:312). Dienestrol is chemically similar to another synthetic estrogen, diethylstilbestrol (DES). DES is also known by a variety of other names including Stilbestrol, Distilbene, and the chemical name 4-[(E)-4-(4-hydroxyphenyl)hex-3-en-3-yl]phenol. Neither DES nor dienestrol was patented as they were discovered as part of a grant from the Medical Research Council of Great Britain. Thus, many companies obtained rights to market the drugs in the United States (U.S.).

11.    As early as 1941, textbooks used to train physicians (Goodman, L. and A. Gilman. 1941. Female sex hormones. In: *The Pharmacological Basis of Therapeutics: A Textbook of Pharmacology, Toxicology and Medical Therapeutics for Physicians and Medical Students.* The MacMillian Co.: New York, chapter 661) contained a discussion of synthetic versus naturally occurring estrogens and their uses in humans. This is the textbook that is still used today to train medical students in the United States; of course much more current editions are used. As the authors stared in 1941, the synthetic estrogens, which included DES, have a different structure than naturally occurring estrogens but *"It is therefore highly probable that a common type of structure is responsible for the pharmacological activity of both the natural and synthetic estrogens."* (see page 1202 of Goodman and Gilman, 1941). Clearly, even as early as 1941, scientists understood that synthetic estrogens had structures that were shared among agents

---

1  This is the first edition of a textbook that is still published today but is now in its 12th edition.

which led to similar pharmacological activity. It is also important to note that in this early textbook, the authors acknowledged that the advantages of the synthetic estrogens included their ability to be administered orally, and their low cost (see page 1204 of Goodman and Gilman, 1941). Importantly, however, the authors also stated that *"These are main advantages of the drug over the natural estrogens, but stilbestrol must be demonstrated to be relatively non-toxic before factors of cost and ease of administration can be permitted to determine the choice of preparation."* (see page 1204 of Goodman and Gilman, 1941). This demonstrates that even as early as the 1940's it was standard practice in the field of pharmacology and toxicology, as they relate to drug development, to provide scientific evidence of safety before a product was to be used routinely in humans.

12.      Given that dienestrol has a structure that is very similar to DES (see Figure 1 below), this means that, based on general principles of pharmacology and toxicology, the two compounds would have similar pharmacological and toxicological profiles. As synthetic estrogen compounds, both DES and dienestrol had biological activity that mimicked the endogenous hormone estrogen. For example, in the 1949 volume produced by the American Medical Association (AMA, 1949), both dienestrol and DES are listed as having the same actions, both pharmacological and toxicological, namely use to produce the same actions as estrogenic substances. Because of these similarities, both DES and dienestrol were investigated and used as treatments for conditions where estrogen levels were thought to be too low. Physicians and scientists understood as far back as the 1940's that DES and dienestrol were similar drugs in terms of their pharmacological and toxicological profile (AMA, 1949). The labeling for these products in the early 1950's contained statements that dienestrol was the same as DES (see dienestrol labeling 1951). More recent studies show that the two chemicals share many of the same toxic effects, including risks to the developing fetus (*e.g.,* Herbst *et al.* 1971; Herbst *et al.* 1976). Importantly, the companies developing these drugs for use in humans provided the same materials to the FDA review as part of the regulatory submissions for dienestrol and DES. As a result, published studies discussing the effects associated with either drug in animals and in humans are relevant to assessing the risks posed to humans for both drugs.

5

Figure 1

**Dienestrol,dihydrostilbestrol**
**[Synestrol; Dienoestrol; 4,4-(Diethylideneethylene) diphenol]**

$C_{18}H_{18}O_2$

HO —⬡— C(=CH—CH$_3$)... 

$C_{18}H_{18}O_2$

**Diethylstilbestrol [stilbestrol]**

$C_{18}H_{20}O_2$

13.     Dienestrol was marketed as a human prescription drug product in the United States and worldwide. It is the drug manufacturer that is responsible for ensuring that its product is both safe and effective for its labeled uses. The FDA does no testing itself. Instead, the FDA relies on companies to provide them with accurate and reliable information to show that the drug has therapeutic activity and is also safe for use in humans. FDA makes its decisions about drug approval based on the information provided by the company.

14.     Dienestrol entered the marketplace in 1946, when the 1938 Federal Food, Drug and Cosmetic Act (FFDCA) would have been in effect. This law was passed in response to tragedies that resulted from use of Elixir of Sulfanilamide and Lash Lure®. Both events were associated with deaths and serious injury in consumers. Thus, the 1938 Act required for the first

6

time that new drugs be subjected to a pre-market safety evaluation. Manufacturers were required to submit both preclinical data (animal and other non-human data) and clinical (human) data on the new drug. Unlike current regulations, however, FDA had a limited time for review of the information submitted by the manufacturer and there was no formal approval process. Instead, it was assumed that the drug would be approved, and the FDA had a maximum of 180 days to complete its safety review. The types of safety studies were not prescribed by the 1938 law but instead "adequate studies" were requested and drugs were to be studied by "all methods reasonably applicable to show whether or not the drug is safe" (FFDCA Section 505). The 1938 law also changed the paradigm for access to drugs where the physician became an integral part of the process through prescription-writing.

15.    In the aftermath of the thalidomide tragedy, the Kefauver-Harris amendments to the FFDCA were passed in 1962. These amendments increased FDA oversight of the drug development process. A major provision of the law was that new drugs must be shown to be effective as well as safe. This led to the conduct of more extensive preclinical and clinical testing on new drugs before they could be marketed. Additionally, FDA acquired the authority to withdraw approval of an NDA in situations where new information became available showing that a product was unsafe or that a manufacturer had failed to provide FDA with accurate information.

16.    Although detailed guidance on the methods for testing new drugs were not in place until the 1970's, even in the 1950's FDA had expectations for what adequate types of testing entailed.  For example, in a 1944 publication by FDA officials (Van Winkel *et al.* 1944), the general process for developing drugs for use in humans was discussed. The process was stated to include first preliminary observations which give information on the utility of a compound, followed by laboratory testing that was focused on understanding the mechanism of action of the drug "and its toxicity" (see page 959 of Van Winkle *et al.,* 1944).  Then, among the types of toxicity testing stated to be performed were acute toxicity testing, subacute toxicity testing, chronic toxicity testing, local effects testing, and a variety of other studies that included explicitly studies on "reproduction". Many of the other commonly employed principles for guiding toxicity testing for new drugs also were described in the 1940's, including use of

multiple species to ensure that the toxicity profile is adequately defined, keeping careful records of all data, and then preforming a critical review of all collected data. The questions mentioned that need to be answered in terms of drug use included: *1) Has the drug definite and desirable pharmacodynamics or chemotherapeutic actions?; 2) Are its actions constant and reproducible?; 3) Are the actions observed in different species of animals?; 4) Is the mechanism by which the actions are produced a desirable one, or are the actions the result of an ultimately undesirable reaction of the animal?; 5) Are the effects obtained in animals in which experimentally produced pathologic ir functional changes comparable to human diseases have been made?; 6) What is the therapeutic index of the compound (ratio of effective dose to toxic dose: ED50/LD50)?; 7) Are the undesirable side actions of sufficient importance and severity to militate against its use: and 8) Is there an adequate margin of safety in its use?* (see pages 959-960 of Van Winkle *et al.* 1944).

17.    The FDA authors also go on to discuss the clinical testing program, called clinical observations by the authors,  and the characteristics of such testing in terms of drug development by companies. Consistent with general principles of clinical testing today, the primary objectives for testing listed in 1944 were 1) to determine the therapeutic efficacy, and 2) to detect all signs of clinical intolerance or toxicity. Secondary considerations included the need to determine the contraindications and precautions to be observed in the use of the drug. Then, for each new drug product the authors state that certain characteristics should also be found in the clinical investigations that are performed. These included selection of subjects based on consideration of confounding factors, having a method the objectively proves a diagnosis, using controls in the study, performing observations during the study treatment period, using enough subjects to allow for statistical analysis of the data, controlling the administration of the drug, establishing a clear criteria for demonstrating efficacy in the trial, use of blinded testing, allowing for sufficient time to ensure that all harmful effects of the drug have been elucidated, and use of more than one investigator to show that results are independently verified.  Again, these criteria and controls on clinical testing are very similar to the types of considerations that go into design and performance of clinical testing today.

18.    In the modern era of drug development (1970's to today), the data companies develop include preclinical (non-human) data that examines the pharmacology of the active ingredient as well as the toxicology of the active ingredient and the formulated drug product. The toxicology studies that companies sponsor or perform are animal studies that use common mammalian species such as rats, mice, and dogs.  In some cases, studies may be performed using non-human primates, pigs, guinea pigs and rabbits. Typically, these preclinical studies form the basis of the submission to the FDA referred to as the Investigational New Drug (IND) application. In the 1950's, preclinical testing for toxic effects of drugs was a standard practice, although an IND submission was not required. As already mentioned in paragraph 16 above, the necessary toxicology studies, listed by FDA officials who authored the paper, included testing for effects on reproduction in animals (Van Winkel et al. 1944). Thus, even though the drug development process in the 1940's and 1950's was different in terms of the required FDA submissions, the standards in place did include the need to provide adequate studies demonstrating safety, and effects on reproduction and development of the fetus were of concern. This was specifically described by FDA officials in 1959 when they published the first in a series of guidance documents outlining how to assess safety of chemicals in foods, drugs and cosmetics (FDA, 1959). This guidance included the need to perform reproductive toxicity studies in animals and to examine the effects on the developing fetus. With respect to the types of studies that were available in the 1950's, it has been stated that had thalidomide been tested in animals using the types of studies that were available in at the time it was being developed, the manufacturer would have identified the hazard to the fetus, preventing the tragedy (Gad, S.C., 2015).

19.    In the modern era, also submitted with the IND application is a proposed clinical testing plan. Once the FDA has reviewed and approved the IND application, clinical testing can begin. Clinical studies for any human prescription drug typically include three phases (*i.e.,* Phase I, Phase II and Phase III) of highly controlled clinical studies that involve thousands of patients. In the 1950's when dienestrol was developed, the FDA regulations did not require such extensive clinical testing to demonstrate efficacy and safety. Yet, the modern controlled clinical trial, one with a statistical basis for both design and interpretation of data, *"became a critically important part of evidence-based medicine in the U.S. following WWII"* [World War II] (see

9

http://www.fda.gov/AboutFDA/WhatWeDo/History/Overviews/ucm304485.htm).     As     FDA
describes, it did not have authority to require clinical trials under the 1938 FFDCA although
FDA did establish rules about the use of drugs in clinical investigations (Van Winkel *et al.*
1944). One of the earliest examples of a controlled clinical study and its use in drug approval
was the 1948 paper where Dr. A.B. Hill used randomized controls to establish the efficacy of
streptomycin to treat tuberculosis (MRC, 1948). Thus, the concept of proper controls for clinical
studies in the 1940's included the need to randomize patients as well as to provide for other
controls when assessing drug efficacy. This was discussed above in paragraph 17 where FDA
officials provided a summary of clinical testing in the 1940's, specifically stating that clinical
testing needed to include things such as proper controls, use of statistics to demonstrate efficacy
in clinical testing, and the use of multiple investigators to ensure that results could be replicated
independently.

20.     At issue in this case are the toxic effects of dienesterol that are produced when
humans were exposed *in utero* through use of the drug by their pregnant mothers. This drug was
intended for use by pregnant women, and was marketed with one of its indications being for
"threatened abortion", *i.e.,* prevention of spontaneous abortion or miscarriage. Therefore, the risk
of the drug to the developing fetus was always an issue that any  drug manufacturer needed to
address if they were going to assert that their drug had been adequately studied such that the
safety of the drug had been proven (*i.e.,* the FDA standard after the passage of the 1938 FFDCA.

21.     It is important to realize that it was recognized in the early 1900's that drugs,
especially estrogen hormones, could transfer across the placenta to a developing fetus. For
example, in 1937 it was described in the medical literature that high levels of estrogen are stored
in the placenta and, as expected, estrogen was then found in the blood and urine of babies after
birth (Lyons, 1937). The ability of estrogen to cross the placenta was confirmed in 1942 (Sklow,
1942). In 1940, a paper discussed the effects of sulfanilamide on the developing fetus when
administered during pregnancy (Speert, 1940); equal levels of the drug were found in the blood
of the dams and the pups, demonstrating that the drug crossed the placenta. In 1947, a paper
reported that urethane crossed the placenta of mice during pregnancy and was associated with
pulmonary tumor induction in the pups (Larsen *et al.* 1947). In an important group of studies

starting in the 1950's, the teratogenic effects of cortisone administration in pregnant animals and humans were reported. These studies are important because they demonstrated that a drug mimicking the effects of a human hormone (cortisol) had adverse effects on fetal development when given to dams in doses not encountered in normal physiology. In 1950, a study was published showing that cortisone administration to pregnant mice resulted in birth defects, specifically cleft palate (Baxter and Fraser, 1950). This finding was confirmed by others in animals (*e.g.,* Fraser and Fainstat, 1951; Fraser *et al.* 1953; Ingalls and Curley, 1957; Chaudhry *et al.* 1966). Therefore, it was established by the 1950's that drugs and chemicals, especially hormones like estrogen, can cross the placenta during pregnancy and elicit adverse effects on the developing fetus.

22.     It was also known in the 1950's that drugs can have latent effects, that is and effect that may not be observed until some period of time after the exposure has ended. For example, the 1947 study with urethane in pregnant mice showed that lung tumors did not develop in the offspring of treated dams until six months of age (Larsen *et al.* 1947). In the case of exposure in humans to a drug during pregnancy, this means that an effect may not be evident until development is complete in the exposed individual, a latency that could be years after exposure *in utero*. This issue of latency of drug effects was confirmed in the 1970's for the synthetic estrogens (discussed below).

23.     The issue of drug-induced effects on a developing fetus became an important drug development concern following the thalidomide tragedy in 1961. Thalidomide was another drug intended for use by pregnant women, whose use turned out to cause birth defects, specifically limb reduction defects, in many of the exposed babies. As a result of this tragedy (largely confined to Europe, but well-known in this country due to the efforts of the FDA's Dr. Frnaces Kelsey to keep the drug off the American market because of inadequate safety data from the manufacturer), drug manufacturers were aware, or should have been aware, that drugs intended for use in pregnancy needed to be tested for the potential to produce such effects in standard animal studies that were available at that time (*i.e.,* teratology testing in rats and rabbits). This would apply to drugs already on the market as well as drugs being newly developed. As a result, dienestrol should have been tested for teratogenicity at least by the time of the thalidomide

tragedy. This is particularly true given that in 1959, a pioneer in the area of teratology, Dr. James Wilson published five general principles of teratology (Wilson, J., 1959) which stated:

> 1) The susceptibility of an embryo depends upon the developmental stage at which a teratogenic agent is applied.
>
> 2) Each teratogenic agent appears to act in a specific way on a particular aspect of cellular metabolism.
>
> 3) The genotype of the animal influences to a greater or lesser degree the reaction to a teratogenic agent.
>
> 4) Agents that cause malformations also cause a rise in embryonic mortality.
>
> 5) Teratogenic agents may have little or no deleterious action on the maternal organism.

These general principles were developed based on the accumulation of scientific data over several decades and the recognized need to focus on risks to developing organisms when humans are exposed *in utero*. Moreover, as early as 1959, FDA had acknowledged the need to look at toxicity across generations, including exposure to chemicals *in utero*, when it outlined the protocol for the first 3-generation reproductive toxicity study in rats (FDA, 1959). As discussed in the medical literature in 1964, scientists were aware of the need to examine teratogenic effects of drugs, with the only controversy being over the best study design, not whether there was a need to do such testing (Brent, R.L., 1964). This was further emphasized by Dr. Wilson in his 1979 overview of the evolution of teratology testing where he observed that with the thalidomide tragedy it was apparent to industry, the government and medicine that *in utero* exposure to chemicals posed a real risk to the developing fetus (Wilson. J., 1979).

24.    In fact, based on what had been published in the medical literature by the 1950's, drug manufacturers were aware, or should have been aware, of the importance of teratogenicity testing as a method to test the safety of drugs for use in pregnant women. An example of the published studies reporting results of teratogenicity testing included a series of animal experiments published in the 1940's where maternal dietary deficiencies in rats were shown to adversely affect fetal development (Warkany and Nelson, 1940; Warkany and Schraffenberger, 1944; Wilson *et al.* 1953b). Also in the 1940's, it was reported that children born to women infected with the rubella virus during the first trimester of pregnancy exhibited birth defects

(Gregg, 1941). The issue of chemically-induced birth defects was further demonstrated by papers published on the effects of sulfanilamide (Speert, 1940), azo dyes (Wilson 1955), insulin coma therapy (Wickes 1954), and quinine (Winckel, 1948) to list only a few of the published studies. Importantly, in 1958, estrogen compounds were tested using a standard type of teratology study design and they were shown to be teratogenic in mice (Nishihara, 1958).

25.     It is clear that over the decades from the 1940's to the 1970's and even to today, there has been an evolution in terms of the types of toxicity testing that is routinely performed during drug development.   Even though the toxicology testing requirements have been formalized over the decades and guidance documents have been developed, the basic principles of toxicology testing have not changed. These would include the need to perform studies involving multiple species, to employ multiple dosing regimens (acute versus repeat dose testing), to examine all relevant routes of exposure for humans, and to examine various endpoints of toxicity (*i.e.,* effects on liver, kidney, heart, brain, reproduction, *etc.*) (Van Winkel *et al.* 1944; FDA, 1959; Gallo, M.A. and J. Doull, 1991). In the 1950's, FDA scientists, led by Dr. Arnold J. Lehman, focused on the need for adequate toxicity testing to ensure that products regulated by the Agency, including drugs, were safe for use in humans. Their efforts resulted in publication of a set of standards for toxicity testing that included discussion of risks to developing organisms (FDA, 1959). As a result, drug manufacturers in the 1950's knew, or should have known, and by the early 1960's certainly knew, that animal testing for hazards to developing organisms was an important safety concern.

## IV.     Pharmacology and Toxicology of Dienestrol

26.     As discussed above, dienestrol was a synthetic estrogen compound chemically similar to DES. As a result, the pharmacology and toxicology of these drugs is essentially the same as that of estrogen itself. The pharmacological effects of estrogen and related compounds were well known by the 1950's (AMA, 1949). The toxicological, or adverse, effects of estrogen and related synthetic estrogen compounds were also well known in the 1950's (AMA, 1949). It is important to note that dienestrol was more potent than naturally occurring estrogen, with reports indicating it was one of the most potent synthetic estrogens (Sikkema and Severinghaus, 1947). The promotional materials of White Laboratories Inc. (WLI) reported that dienestrol was

13

two times more potent than DES, up to five times more potent than estrone, and up to six times more potent than hexestrol (MRKDEN-000964 through 000983).

27.     Dienestrol is metabolized by the liver in a similar manner as other synthetic estrogens, although the amounts of the specific reactive intermediates formed differs depending on the compound considered (Metzler and McLachlan, 1982).  Like DES, dienestrol is activated by liver metabolic enzymes. It is the biotransformation of these compounds that has been shown to be a critical factor in the effects of dienestrol and DES on the developing organism (Beyer *et al.* 1989).

28.     In the case of dienestrol, early studies specifically investigated its activity in menopausal women (*e.g.* Barnes, J. 1944; Finkler et al. 1947. Am. J. Obstet. Gynecol. 53:513-519; Sikkema, S.H. and E.L. Sevringhaus. 1947. Am. J. Med. 2:251-252; Rakoff et al. 1947. J. Clin. Endocrinol. 7:698-700; Vivano, J.G. 1948. Am. J. Obstet. Gynecol. 56:921-924; Murdoch, R. and W.P. Black. 1959. Br. Med. J. 2:678-679). It was also used to suppress lactation in women post-partum (Kosar, 1953). The initial marketing of dienestrol was to treat symptoms of menopause. The doses used in women ranged from 0.1 to 1.5 mg per day (PDR, 1965).

29.     In 1950, FDA authorized the marketing of dienestrol for use in pregnant women to prevent early spontaneous abortion and maintain pregnancy. Its use was widespread in this population by the 1960's. The clinical use in pregnant women was based on the observations by one clinical investigator that megadose estrogen treatment with DES would increase progesterone levels in women during pregnancy (Smith, O.W., 1948). The physician had observed that women who miscarried had low levels of progesterone in urine, and therefore, increasing progesterone levels during pregnancy presumably would be beneficial and prevent early abortions. Doses given to women varied depending on the week of gestation, with daily doses of from 5 mg/day to as much as 125 mg/day[2]. The published study was actually a case series of physician experience in using DES to prevent abortions during pregnancy. Three different populations of women were studied: there were 219 case reports of use in women for

---

2 The regimen was as follows: 5 mg/day at week 6 or 7, increases of 5 mg/day at two week intervals up to week 15 (total daily dose at week 15 = 25 mg/day), increases of another 5 mg/day at weekly intervals up to week 35 (total daily dose at week 35 = 125 mg/day), and discontinuation at week 35.

threatened abortion (as evidenced by bleeding with or without cramping in weeks 6-21 of pregnancy); 272 case reports of use in women prophylactically due to past history of abortion; and 127 case reports of use in women with chronic history of abortion (repeated, consecutive abortions). This is important to note because this paper does not represent a controlled clinical study of any kind and was not consistent with clinical study design that had been used by others at the time (MRC, 1948; Hogben and Sim, 1953). It should be noted that many other researchers were using a controlled clinical study design in the 1950's and published the results of these clinical studies (*e.g.,* White and Standen, 1953; Spencer and Lloyd-Thomas, 1953; The Rheumatic Fever Working Party, 1955; Hare, 1955; Coady and Jewesbury, 1956; Rushebrooke *et al.* 1956; Donaldson and Duthie, 1956; Newton and Tanner, 1956; Duncan *et al.* 1956) As a result, the case series used to establish the efficacy of DES in pregnant women was not consistent with clinical study design in the 1950's. The key feature of the design of these published clinical studies was the inclusion of a control group (untreated or placebo, use of a comparator drug known to have efficacy, or a cross-over design). In addition to not meeting minimum standards for clinical testing in the 1950's, once the thalidomide tragedy had occurred, a drug manufacturer had a duty to re-examine the safety of any drug being marketed for use in pregnant women. Additionally, given that the doses of synthetic estrogens used to treat pregnant women were much higher than the doses that had been used to treat symptoms of menopause, from 10 mg per day to as much as 100 mg per day (PDR, 1965), the manufacturers of synthetic estrogens had an even greater impetus and duty to re-assess the safety of their drugs by the early 1960's.

30.     Like the pharmacological effects of estrogens, the toxic effects of dienestrol were similar to other synthetic estrogen compounds (AMA, 1949). The expected toxicity included carcinogenesis given the known effects of estrogen at high doses to animals to be associated with mammary tumors. In fat, synthetic estrogens were shown to be as potent as endogenous estrogen itself in the production of mammary tumors in mice (Shimkin and Grady, 1940). As early as 1939, the adverse effects of estrogen on fetal development had been reported (Greene *et al.* 1939a; Greene *et al.* 1939b). The authors reported adverse effects in the development of sex organs including the vagina, uterus and ovaries of mice born to dams receiving synthetic estrogens, as well as adverse effects on sex organ development in rats exposed *in utero* to DES.

15

In 1950, a study in mink showed that synthetic estrogen administration in the feed during mating resulted in an inability of the animals to reproduce (Enders and Merritts, 1950). Estrogens also were shown to be teratogenic in mice (Nishihara, 1958). Importantly, four cases of masculinization were reported in infants whose mothers took DES during pregnancy (Bongiovanni, 1959). Clearly, the published literature had established that synthetic estrogens posed a risk to the developing fetus by 1960, and strongly suggested such a risk by 1950, when WLI first proposed to the FDA an indication for use in pregnant women.

31.     In 1946, WLI was interacting with the FDA concerning a NDA submission for dienestrol (MRKDEN-001276 through 001311). WLI had filed a NDA with FDA on June 25, 1946 (MRKDEN-001311). FDA was now requesting additional pharmacology and toxicology data to support the safety of dienestrol. On August 28, 1946, WLI submitted additional reports to FDA relevant to the safety of dienestrol. The only dienestrol-specific preclinical study directly addressing the toxicity of the drug was one referred to as the Teague study (MRKDEN-001265 through 001275). It is important to note that the study in rats was a subchronic toxicity evaluation (21 and 99 days of dosing), not a chronic dosing study, and the doses used were 9.26 mg dienestrol/kg body weight and 43.7 mg dienestrol/kg body weight. The results showed that dienestrol had toxicity similar to DES as a synthetic estrogen compound. The target organs of toxicity included the reproductive organs of both male and female animals, the pituitary gland, and the adrenal gland. These data clearly showed that dienestrol had adverse effects on reproductive organs and that these effects would be anticipated to occur in humans administered dienestrol. WLI compared dienestrol to DES in terms of toxicity potential. Yet, WLI failed to include in its FDA application a listing of the published literature discussed above that appeared before 1946 and showed that high doses of estrogen caused adverse developmental effects in pregnant animals, including a study on DES in 1939 (Greene *et al.* 1939b).

32.     WLI made NDA submissions to the FDA in 1950 (dated January 9, 1950) and 1955 (dated November 17, 1955) for use of dienestrol in pregnancy. Again, WLI failed to provide FDA with available safety information that demonstrated a risk to the developing fetus with administration of synthetic estrogens, such as DES, as well as endogenous estrogen itself (*i.e.*, Shimkin and Grady, 1940; Greene *et al.* 1939a; Greene *et al.* 1939b; Enders and Merritts,

1950). Moreover, WLI failed to discuss the likelihood that dienestrol crossed the placenta, an important safety concern for pregnant women. The only data submitted to FDA on safe use in pregnancy was limited to the clinical use of dienestrol, reports that were observational case studies, not controlled clinical testing (MRKDEN-001156 through 001172). As already discussed, this is in contrast to results of controlled clinical studies that were being published at that time on other drugs under development (see paragraph 29 above).

33.     WLI marketed dienestrol to physicians for use in pregnant women starting in the 1950's. The pills are described by WLI as 0.1 mg white tablets, 5 mg red tablets and 10 mg yellow scored tablets (PDR, 1966). A review of some of the marketing materials and a training piece for sales representatives (MRKDEN-000964 through 000983) shows that the company failed to discuss the potential risks posed to developing fetuses. In the 1950's and 1960's, physicians typically relied on drug manufacturers to disclose important available safety information on prescription products. This is evidenced by the existence of the Physician's Desk Reference, a compilation of manufacturers' official labeling for their drugs, even before that time, and the fact that it was a resource for safety information as well as indications for use of available prescription drugs (*e.g.,* see 1947 PDR).

34.     In 1972, a published study reported that a large proportion of the daughters of women administered dienestrol during pregnancy had abnormal development of their reproductive tract including adenosis, vaginal epithelial changes, and cervical changes (Herbst, 1972). This paper was one of series of studies showing that the synthetic estrogens were associated with toxicity that included carcinogenic effects in the children born to women who took the drug during pregnancy (*e.g.,* Herbst *et al.* 1971; Herbst *et al.* 1976). As a result of these effects in children, FDA issued a health warning on DES and dienestrol in 1971, resulting in the removal of the drugs from the market. Therefore, it is well-established that when a fetus is exposed to dienestrol and other synthetic estrogens during gestation, the drugs can cause carcinogenicity and dysmorphogenesis of the female reproductive tract. This outcome should have been no surprise to the manufacturers, based on the existence of published literature from the 1940's and 1950's that identified fetal harm in conjunction with use of estrogenic substances.

## V.   Opinions

35.   Based on my review of published scientific literature and other documents in the this case, as well as my training and experience as a pharmacologist, toxicologist and FDA regulatory specialist, I have formed the following opinions. All opinions expressed in this report are based on a reasonable degree of scientific certainty. It is my understanding that WLI is the predecessor company to Defendants in this case. I reserve the right to supplement my opinions as new information becomes available.

36.   First, after review of dienestrol's physical appearance and description as found in marketing materials, it is clear that the physical description matches the description given by Ms. Brownstein's mother concerning the dienestrol pills she remembers taking in 1967.

37.   Before the 1960's, the published medical and scientific literature showed that drugs, such as dienestrol, cross the placenta and pose a risk to the developing fetus. As discussed above, there was evidence before dienestrol was approved for marketing in pregnant women that transplacental exposure of the fetus was a safety concern when drugs were used in pregnant women, including evidence that estrogen compounds produced adverse effects in the developing organism (see paragraphs 21 and 24). By 1960 there were a variety of published articles showing that high doses of synthetic estrogen can cause adverse developmental effects in animals and in humans, and that synthetic estrogen can cross the placenta (see paragraphs 21 and 24). Other published studies showed that target organs of synthetic estrogen toxicity included breast, the uterus and the vagina (see paragraph 31). Studies had shown that synthetic estrogen was carcinogenic in rodents (see paragraph 30). Additionally, standard methods for testing for teratogenicity in animals were available by the 1950's (see paragraph 24). As a result, by 1960, WLI either knew or should have known about the potential risks posed to a developing fetus when dienestrol was to be given during pregnancy.

38.   Yet, WLI failed to perform any testing on the carcinogenic or teratogenic risks of dienestrol. Such testing was the responsibility of the drug manufacturer, not the FDA. Even in the 1950's and early 1960's, drug companies were testing new drugs for such endpoints of toxicity (*e.g.,* Berger, 1954; FDA, 1959).

39.     It is important to remember that the clinical studies that formed the basis of dienestrol's New Drug Application (NDA) were uncontrolled studies with the chemically similar drug DES, studies conducted by a single laboratory (Smith, O.W., 1948). As discussed above in paragraph 17, FDA officials provided to the industry in the 1940's a summary of standards for clinical testing, specifically stating that clinical testing needed to include things such as proper controls, use of statistics to demonstrate efficacy in clinical testing, and the use of multiple investigators to ensure that results could be replicated  independently. By 1967, when the plaintiff was exposed to dienestrol *in utero*, controlled clinical testing was a standard for drug development (FDA, 1959; Notice of Proposed Rulemaking, 27 Fed. Reg. 7990, August 10, 1962 as cited at ww.fda.gov/AboutFDA/WhatWeDo/History/Overviews/ucm304485.htm).

40.     Another important issue related to clinical testing and efficacy of synthetic estrogens, including dienestrol, was that a placebo-controlled clinical study by Dieckmann *et al.* (1953) attempted to replicate the findings of the uncontrolled observational data from the Smith laboratory. The authors reported that DES, administered in the same regimen as employed by the earlier studies, was not effective for treatment of complications of pregnancy. Given that the efficacy of dienestrol was in question by 1953, WLI knew, or should have known after these data were available in 1953 that the margin of safety of the drug was also now in question. This is because with the controlled clinical studies showing no efficacy as claimed, any risks posed by the drug would be unacceptable, particularly in pregnant women.

41.     The efficacy of dienestrol as a drug for use in pregnancy was never proven based on testing in adequately controlled clinical studies. The NDA for dienestrol included observational reports from physicians of such use in patients without comparisons to adequate control groups. In fact, studies were published in the 1950's that reported no efficacy for the indication of preventing miscarriage when synthetic estrogens were administered to pregnant women (*e.g.,* Dieckmann *et al.* 1953; Ferguson, 1953). With the lack of adequate data to support the efficacy of the drug for its indicated use in pregnancy, the risks of dienestrol clearly outweighed any benefit to pregnant women.

42.     It is also important to note that in 1947 an investigator raised several important questions that needed to be answered concerning the safety of synthetic estrogen use in pregnant women (Rosenblum, 1947). These included: 1) Will DES in large doses cause pituitary or other glandular imbalance which will become manifest later in life?; 2) Is DES in such large doses carcinogenic, and as such unsafe to give even to pregnant women?; and 3) Can DES in any way affect the glandular balance of the child in utero, particularly the male child?  Rosenblum's concerns about DES applied equally to dienestrol, given the similarity of the two drugs (see paragraphs 10 through 12 above). Since WLI never performed any chronic safety studies or teratology studies on dienesterol, these important safety concerns were never addressed before the drug entered the market for use in pregnant women in the 1950's.  The lack of testing for dienestrol put the health of patients and their unborn children at risk.

43.     The lack of adequate toxicity testing was of particular concern when the drug began to be used in pregnant women. This is because the doses that had been used in post-menopausal women were from 50 to 1000 times lower than the daily doses that were used in pregnant women.3 To put the dose in perspective, the dose of dienestrol that was ingested by pregnant women was the equivalent of taking over 600 birth control pills each day.4 This large increase in dose of dienestrol for a particularly susceptible population (the developing fetus) was not scientifically defensible, even in 1960, given the high potency of the drug, the ability of estrogens to cross the placenta, the known teratogenic risk posed by synthetic estrogens, the target organs of toxicity of the drug (reproductive organs), and the potential for latent toxic effects given the known carcinogenic risks of the synthetic estrogens. These facts, when considered with the fact that the company failed to perform safety testing in developing organisms, demonstrate that WLI put patients and their children at risk well before the plaintiff's exposure *in utero* to dienestrol in 1967.

44.     As the manufacturer of dienestrol, WLI was responsible for ensuring that the drug products it marketed were safe and effective for indicated uses. As already discussed, by 1960

---

3 Indicated doses for treatment of symptoms of menopause were from 0.1 to 1.5 mg/day while doses used in pregnant women were from 5 to 100 mg/day (5 mg/0.1 mg = 50; 100 mg/0.1 mg = 1000).
4 The first birth control pills marketed contained 0.150 mg estrogen (daily dose). Therefore, taking 100 mg dienestrol/day was equivalent to taking over 600 birth control pills each day. Birth control pills today can contain even lower doses of estrogen (*i.e.,* 0.035 mg given each day).

WLI knew, or should have known, that dienestrol posed a teratogenic risk to the developing fetus. The pharmaceutical industry by the middle of the 1960's was aware of the dangers to the fetus posed by passage of drugs across the placenta. Accordingly, responsible manufacturers were testing their products intended for use in pregnancy for possible teratogenic effects and warning about such risks. Yet, physicians were never provided warnings for such effects. In fact, a review of the labeling and marketing materials dating back to the 1950's show that WLI marketed dienestrol as "potent, safe, and unusually well-tolerated" and for use in pregnant women (see product information from 1951). Importantly, the marketing materials for dienestrol also failed to list the published medical literature that demonstrated the drug posed a risk to the developing fetus (see bibliography; MRKDEN-001057). As a result, physicians and their patients were not provided with accurate and complete information concerning the known risks of dienestrol, risks that were known, or should have been known, to the company.

45. Although the dienestrol label contained statements about the risk of cancer and the contraindication of the drug in women with "a familial or personal history of malignancy of the reproductive organs or the breast" (PDR, 1965), the labeling before 1967 never warned physicians about the specific risks of teratogenicity, the risk of latent effects in their children, and the fact that the drug was able to cross the placenta (see PDR, 1966). As a result, the dienestrol labeling was false and misleading. Additionally, given the lack of controlled clinical studies demonstrating that dienestrol was effective for the uses indicated, label statements such as "an orally effective, potent, and unusually well-tolerated synthetic estrogen..." is also false and misleading. The label is misleading in asserting that it differs chemically from DES and other synthetic estrogens, particularly given that the NDA for dienestrol relied on data for DES to support its approval. The statements in the label about "advantages" are also problematic given that no controlled studies had been conducted to demonstrate that it was "exceptionally well-tolerated" and had "fewer side effects" as compared to DES and other related synthetic estrogens.

46. In contrast to the labeling for dienestrol, other drug companies had statements in their product labeling by 1966 that warned about use of the drugs in pregnancy. For example, the labeling in 1966 for Corticosporin®, an ointment that contained polymixin B, bacitracin and

neomycin, had a statement that *"As the safety of topical steroid preparations during pregnancy has not been fully established, they should not be used uneccessarily, on extended areas, in large amounts, or for prolonged periods of time, in pregnancy."* (PDR, 1966). The 1966 label for Alkeran® (melphalan) stated *"Whenever possible, use of the drug should be avoided during the first trimester of pregnancy."* (PDR, 1966). The 1966 label for Dymelor® states that the drug is contraindicated in pregnancy; importantly, the drug had been tested in multi-generation animal studies to assess potential effects on the developing fetus. Other drugs with warnings about use in pregnancy in the 1966 PDR include Pentergot®, Chymar®, Tofranil®, Haldrone®, Tepanil®, Combid®, Dyrenium®, Stelazine®, Winstrol®, Tandearil®, Esedrix®, and Leukeran® (PDR, 1966). Clearly, pregnancy warnings were used on many different drug labels before 1967.

47.     As the manufacturer of dienestrol, WLI had a duty to its customers and patients to provide FDA with complete and accurate information regarding the risks posed by the drug (Van Winkel *et al.* 1944). The information required included investigations into effects on reproduction. Given the known effects of synthetic estrogens on fetal development in the 1950's, and the ability of the drugs to cross the placenta, by 1960 WLI should have performed testing of dienestrol in animal models that were available to examine the risks to the developing organism. WLI failed to perform such testing, instead choosing to promote high doses of dienestrol to pregnant women, an action that put patients and their children at risk.

48.     A comparison of the doses of dienestrol that produced toxicity in animals with the doses being administered to pregnant women is important. In the study submitted to FDA as part of the NDA for dienestrol, a dose of 9.26 mg/kg in rats was associated with one death and a variety of other toxic effects in the other treated animals (MRKDEN-001265 through 001275). This toxic effect dose was less than 10-fold higher than a dose indicated for daily use in pregnant women (100 mg/day; PDR, 1965).

49.     A comparison of the doses of synthetic estrogens that were shown to be teratogenic in animals with the doses used in pregnant women shows that there was not an adequate margin of safety for dienestrol. Table 1 below shows comparisons of human doses indicated for pregnant women in terms of daily doses as well as potential total doses that could

be given, with doses shown to be teratogenic in animals.  It is clear that there was no margin of safety when dienestrol was used in pregnant women at the high doses suggested in the product labeling.

| Table 1 | | | |
|---|---|---|---|
| **Comparison of Doses Indicated for Use in Pregnant Women with** | | | |
| **Doses Causing Teratogenicity in Animals** | | | |
| **Human Dose (mg/kg[1]/day)** | **Animal Dose (mg/kg[2]/day)** | **Human Dose (mg during gestation[3])** | **Animal Dose (mg during gestation[4])** |
| 1.67 | 0.1 to 1.5 (rat) 5.5 (mouse) | 1610 | 0.8 to 100 (rat) 1 (mouse) |

[1] Assumed a 60 kg woman

[2] Assumed a 200 g rat or a 30 g mouse.

[3] Assumed dosing throughout pregnancy

[4] Dosing was from GD12 to 20 in rats (Greene *et al.* 1939a, 1939b) and GD11 to 16 (Nishihara, 1958)

50.    The comparisons made in Table 1 are important given that, typically, there is at least a 10-fold margin of safety for human drugs when doses to be used in humans are compared to no-observed effect levels in animals; in this case the animal doses were effect levels, not no-observed effect levels. A no-observed effect level means that there were no signs or symptoms of toxicity or any type observed in the animals. Further, regulatory bodies typically set safe doses for humans by dividing a no-observed adverse effect level from an animal study by a safety factor of 100, to account for potential sensitivity differences in humans and animals in response to a chemical (10-fold to account for inter-species variability and 10-fold to account for intra-species variability, or sensitive subpopulations).  Given that dienestrol was to be used throughout pregnancy, the lack of a safety margin was not scientifically defensible. Moreover, the data in animals were available by 1960 and before the plaintiff was exposed to dienestrol *in utero*.

## VI.    Conclusion

51.    In conclusion, based on my skill, knowledge, education, experience and training as a pharmacologist, toxicologist and risk assessor, it is my opinion that the manufacturer of

dienestrol violated industry standards by never appropriately establishing that the drug was safe for use in pregnant women, or was actually effective to prevent miscarriage. With the lack of adequate data to support the efficacy of the drug for its indicated use in pregnancy, the risks of the drug clearly outweighed any benefit to pregnant women. The failure of WLI to adequately test dienestrol regarding the potential risks to the fetus resulted in injury to the plaintiff. The failure of WLI to provide physicians and their patients with accurate and complete information on the risks posed to developing organisms put the unborn children of women at risk.

52.     I reserve the right to supplement my report pending review of any additional discovery that may be performed in this case. It should be noted that all opinions expressed in this report are based on a reasonable degree of scientific certainty.

## VII.   Compensation

53.     My compensation by plaintiff's attorneys in this matter is at the rate of $300.00 per hour for review of documents and materials related to the case and $400.00 per hour for testimony.

Laura M. Plunkett, Ph.D., DABT

## List of References Cited in the Report

American Medical Association (AMA).  1949.  Hormones and synthetic substitutes  In: *New and Nonofficial Remedies*.  Austin Smith, J.B. Lippincott Company: Philadelphia, chapter 16.

Barnes, J.  1944.  Dienoestrol for Menopausal Symptoms.  *Br.Med.J.*  1(4332):79-80.

Baxter, H. and F.C. Fraser.  1950.  The production of congenital defects in the offspring of female mice treated with cortisone. A preliminary report.  *McGill.Med.J*  19(4):245-249.

Berger, F.M.  1954.  The pharmacological properties of 2-methyl-2-n-propyl-1,3-propanediol dicarbamate (miltown), a new interneuronal blocking agent.  *J Pharmacol.Exp.Ther.*  112(4):413-423.

Beyer, B.K. *et al.*  1989.  Biotransformation, estrogenicity, and steroid structure as determinants of dysmorphogenic and generalized embryotoxic effects of steroidal and nonsteroidal estrogens.  *Toxicol.Appl.Pharmacol.*  98(1):113-127.

Bongiovanni, A.M., A.M. Di George, and M.M. Grumbach.  1959.  Masculinization of the female infant associated with estrogenic therapy alone during gestation: four cases.  *The Endocrine Society*  19(August):1004-1011.

Brent, R.L.  1964.  Drug testing in animals for teratogenic effects.  Thalidomide in the pregnant rat.  *J Pediatr.*  64:762-770.

Campbell, N.R. *et al.*  1939.  Biological effects of the synthetic oestrogen hexoestrol 4:4'dihydroxy-γ : δ-diphenyl-*n*-hexane. *Lancet*  239(6049):312-313.

Chaudhry, A.P., S. Schwartz, and J.A. Schmutz, Jr.  1966.  Effects of cortisone and thalidomide on morphogenesis of secondary palate in A / Hej mice.  *J.Dent.Res.*  45(6):1767-1771.

Coady, A. and E.C. Jewesbury.  1956.  A clinical trial of benactyzine hydrochloride (suavitil) as a physical relaxant.  *Br.Med.J*  1(4965):485-487.

Dieckmann, W.J. *et al.*  1953.  Does the administration of diethylstilbestrol during pregnancy have therapeutic value?  *Am.J Obstet.Gynecol.*  66(5):1062-1081.

Dodds, E.C., W. Lawson, and R.L. Noble.  1938.  Biological effects of the synthetic Œstrogenic substance 4:4'-dihydroxy- α : ß-diethylstilbene.  *Lancet*  231(5990):1389-1391.

Dodds, E.C. *et al.*  1938.  Estrogenic activity of certain synthetic compounds.  *Nature*  141(3562):247-248.

Donaldson, E.M. and D.A. Duthie.  1956.  Clinical trial of glycyrrhetinic acid ointment.  *Br.Med.J*  2(5002):1161

25

Duncan, L.J., J.D. Baird, and D.M. Dunlop. 1956. A clinical trial of BZ 55. *Br.Med.J* 2(4990):433-439.

Enders, R.K. and W.L. Merritts. 1950. Mink production in relation to stilbestrol. *The Fur Journal* 16(7):4,10

Ferguson, J.H. 1953. Effect of stilbestrol on pregnancy compared to the effect of a placebo. *Am.J Obstet.Gynecol.* 65(3):592-601.

Finkler, R.S. and S. Becker. 1947. A preliminary evaluation of dienestrol in the menopause. *Am.J.Obstet.Gynecol.* 53(3):513-519.

Fraser, F.C. and T.D. Fainstat. 1951. Production of congenital defects in the off-spring of pregnant mice treated with cortisone; progress report. *Pediatrics* 8(4):527-533.

Fraser, F.C., T.D. Fainstat, and H. Kalter. 1953. [The experimental production of congenital defects with particular reference to cleft palate]. *Etudes Neonatales.* 2(2):43-58.

Gad, S.C. 2015. Introduction In: *Animal Models in Toxicology*, *3rd Edition edition*. Shayne Cox Gad, CRC Press; Taylor & Francis Group: Boca Raton, FL, chapter 1.

Gallo, M.A. and J. Doull. 1991. History and scope of toxicology In: *Casarett and Doull's Toxicology, The Basic Science of Poisons*, *4th edition*. Amdur, M. O, Doull, J., and Klaassen, C. D., Pergmanon Press, Inc..: New York, NY, chapter 1.

Goodman, L. and A. Gilman. 1941. Female sex hormones In: *Goodman & Gilman's The Pharmacological Basis of Therapeutics* , *1st edition*. Louis S.Goodman and Alfred Gilman, The Macmillan Company: New York, NY, chapter 66.

Greene, R.R., M.W. Burrill, and A.C. Ivy. 1939a. Experimental intersexuality: The paradoxical effects of estrogens on the sexual development of the female rat. *The Anatomical Record* 74:429-438.

Greene, R.R., M.W. Burrill, and A.C. Ivy. 1939b. Experimental intersexuality: Modification of sexual development of the white rat with a synthetic estrogen. *Proc.Soc.Exp.Biol.Med.* 41:169-170.

Gregg, N.M. 1941. Congenital cataract following German Measles in the mother. *Transactions of Ophthalmological Soc.of Australia* 3:35-46.

Hare, E.H. 1955. Comparative efficacy of hypnotics a self-controlled, self-recorded clinical trial in neurotic patients. *Br.J Prev.Soc.Med.* 9(3):140-146.

Herbst, A.L., H. Ulfelder, and D.C. Poskanzer. 1971. Adenocarcinoma of the vagina. Association of maternal stilbestrol therapy with tumor appearance in young women. *N.Engl.J Med.* 284(15):878-881.

Herbst, A.L., R.J. Kurman, and R.E. Scully. 1972. Vaginal and cervical abnormalities after exposure to stilbestrol in utero. *Obstet.Gynecol.* 40(3):287-298.

Herbst, A.L. 1976. Summary of the changes in the human female genital tract as a consequence of maternal diethylstilbestrol therapy. *J.Toxicol.Environ.Health Suppl* 1:13-20.

Hogben, L. and M. Sim. 1953. The self-controlled and self-recorded clinical trial for low-grade morbidity. *Br.J Prev.Soc.Med.* 7(4):163-179.

Ingalls, T.H. and F.J. Curley. 1957. The relation of hydrocortisone injections to cleft palate in mice. *N.Engl.J.Med.* 256(22):1035-1039.

Kosar, W., W. Nash, and C.L. Buxton. 1953. The use of dienestrol to inhibit lactation in nonnursing mothers. *Am.J.Obstet.Gynecol.* 65(3):639-643.

Larsen, C.D., L.L. Weed, and P.B. Rhoads Jr. 1947. Pulmonary-tumor induction by transpacental exposure to urethane. *J Nat.Cancer Inst.* 8:63-70.

Lyons, W.R. 1937. The hormonal basis for "Witches' Milk". *Proc.Soc.Exp.Biol.Med.* 37:207-209.

Medical Research Council. 1948. Streptomycin treatment of tuberculous meningitis. *Lancet* 1(6503):582-596.

Metzler, M. and J.A. McLachlan. 1982. Oxidative metabolism of the synthetic estrogens hexestrol and dienestrol indicates reactive intermediates In: *Biological Reactive Intermediatres - II: Chemical Mechanisms and Biological Effects.* Robert Snyder, David J.Jollow, and Dennis V.Parke et.al., Springer Science+Business Media: New York.

Murdoch, R. and W.P. Black. 1959. Senile vaginitis treated with dienoestrol cream. *Br.Med.J.* 2(5153):678-679.

Newton, D.R. and J.M. Tanner. 1956. N-acetylpara-aminophenol as an analgesic; a controlled clinical trial using the method of sequential analysis. *Br.Med.J* 2(5001):1096-1099.

Nishihara, G. 1958. Influence of female sex hormones in experimental teratogenesis. *Proc.Soc.Exp.Biol.Med.* 97(4):809-812.

Physician's Desk Reference (PDR). 1947. *Physicians' Desk Reference to Pharmaceutical Specialties and Biologicals (PDR).* 1st Edition. J. Morgan Jones, Medical Economics Inc.: Rutherford, NJ.

Physician's Desk Reference (PDR). 1965. *Physicians' Desk Reference to Pharmaceutical Specialties and Biologicals (PDR).* 20th Edition, Medical Economics Inc.: Oradell, NJ.

Physician's Desk Reference (PDR). 1966. *Physicians' Desk Reference to Pharmaceutical Specialties and Biologicals (PDR).* 21st Edition, Medical Economics Inc.: Oradell, NJ.

Rakoff, A.E., K.E. Paschkis, and A. Cantarow.  1947.  A clinical evaluation of dienestrol, a synthetic estrogen.  *J.Clin.Endocrinol.Metab*  7(10):688-700.

Rosenblum, G. and E. Melinkoff.  1947.  Preservation of the threatened pregnancy with particular reference to the use of diethylstilbestrol.  *West J Surg.Obstet.Gynecol.* 55(11):597-603.

Rushbrooke, M. *et al.*  1956.  Clinical trial of doriden, a new hypnotic; with note on use of ranking methods in assessing therapeutic effect.  *Br.Med.J*  1(4959):139-142.

Shimkin, M.B. and H.G. Grady.  1940.  Carcinogenic potency of stilbestrol and estrone in strain C3H mice.  *J Nat.Cancer Inst.*  1:119-128.

Sikkema, S.H. and E.L. Sevringhaus.  1947.  Dienestrol; another synthetic estrogen of clinical value.  *Am.J.Med.*  2(3):251

Sklow, J.  1942.  Is human placenta permeable to gonadotropic and estrogenic hormones? *Proc.Soc.Exp.Biol.Med.*  49:607-609.

Smith, O.W.  1948.  Diethylstilbestrol in the prevention and treatment of complications of pregnancy.  *Am.J.Obstet.Gynecol.*  56(5):821-834.

Speert, H.  1940.  The placental transmission of sulfanilamide and its effects upon the fetus and newborn.  *Bull Johns Hopkins Hosp*  LXVI(3):139-155.

Spencer, A.G. and H.G. Lloyd-Thomas.  1953.  Clinical trial of a new oral diuretic.  *Br.Med.J* 1(4817):957-960.

The Rheumatic Fever Working Party.  1955.  Treatment of acute rheumatic fever in children a co-operative clinical trial of A.C.T.H., cortisone, and aspirin; a joint report by the Rheumatic Fever Working Party of the Medical Research Council of Great Britain and the Subcommittee of Principal Investigators of the American Council on Rheumatic Fever and Congenital Heart Disease, American Heart Association.  *Br.Med.J* 1(4913):555-574.

U.S. Food and Drug Administration (FDA).  1959.  *Appraisal of the safety of chemicals in foods, drugs and cosmetics.*

Van Winkle, W *et al.*  1944.  Council on pharmacy and chemistry: Report of the council. Laboratory and clinical appraisal of new drugs.  *J.Am.Med.Assoc*  126(15):958-961.

Viviano, J.G.  1948.  A clinical evaluation of dienestrol in the climacteric.  *Am.J.Obstet.Gynecol.* 56(5):921-924.

Warkany, J. and R.C. Nelson.  1940.  Appearance of skeletal abnormalities in the offspring of rats reared on a deficient diet.  *Science*  92(2391):383-384.

Warkany, J. and E. Schraffenberger.  1944.  Congenital malformations induced in rats by maternal nutritional deficiency.  VI.  The preventive factor.  *J.Nutr.*  27(6):477-484.

White, R.H. and O.D. Standen.  1953.  Piperazine in the treatment of threadworms in children; report on a clinical trial.  *Br.Med.J*  2(4839):755-757.

Wickes, I.G.  1954.  Foetal defects following insulin coma therapy in early pregnancy.  *Br.Med.J.*  2(4845):1029-1030.

Wilson, J.G., C.B. Roth, and J. Warkany.  1953.  An analysis of the syndrome of malformations induced by maternal vitamin A deficiency. Effects of restoration of vitamin A at various times during gestation.  *Am.J.Anat.*  92(2):189-217.

Wilson, J.G.  1955.  Teratogenic activity of several azo dyes chemically related to trypan blue.  *Anat.Rec.*  123(3):313-333.

Wilson, J.G.  1959.  Experimental studies on congenital malformations.  *J.Chronic.Dis.*  10(2):111-130.

Wilson, J.G.  1979.  The evolution of teratological testing.  *Teratology*  20(2):205-211.

Winckel, C.W.  1948.  Quinine and congenital injuries of ear and eye of the foetus.  *J.Trop.Med.Hyg.*  51(1):2-7.